**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 180741-U

Order filed December 6, 2021

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-18-0741 Circuit No. 16-CF-602 |
| WILLIAM N. KRASAWSKI, | ) ) ) | |
| Defendant-Appellant. | ) ) | Honorable David M. Carlson, Judge, Presiding. |

_____

JUSTICE SCHMIDT delivered the judgment of the court.
Justices Lytton and O'Brien concurred in the judgment.

**ORDER**

¶ 1        *Held*:   The evidence is sufficient to sustain defendant's conviction.

¶ 2        The State charged defendant, William N. Krasawski, with two counts of first degree murder

(720 ILCS 5/9-1(a)(2) (West 2016)), stemming from the deaths of Michael Oram and Jamie Wills.

A jury found him guilty, and the court sentenced him to life imprisonment. Defendant appeals,

contesting the sufficiency of the evidence. For the reasons that follow, we affirm.

¶ 3                                I. BACKGROUND

¶ 4    The bodies of Michael and Jamie were discovered in an autobody shop in Joliet, Illinois, on the morning of March 9, 2016. Michael worked in the shop that was owned by his father. Jamie was Michael's paramour. Michael was found seated in a collapsible lawn chair while Jamie was found suspended by her clothing on a jack handle. The jack was holding up a blue Mazda. Reports indicated that Michael and Jamie were bludgeoned to death.

¶ 5    The State filed a two-count indictment charging defendant with first degree murder. Count I alleged that defendant, without lawful justification, struck Jamie in the head with a blunt object, thereby causing her death. Count II alleged that defendant, without lawful justification, struck Michael in the head with a blunt object, thereby causing his death. A jury trial ensued.

¶ 6    Douglas Oram Sr., Michael's father, testified that he owned the autobody shop where the murders took place. Michael worked in the shop but did not have keys to the building. Doug Sr. underwent an eye procedure on March 8, 2016. He gave the autobody shop keys to Michael prior. The day after the eye procedure, Doug Sr. called Michael at the shop, but no one answered.

¶ 7    Doug Sr. went to the shop to check in. Upon arrival, he noticed that the front door was locked, which was unusual for that time of the day. He then walked around and along the side of the building toward the back where there was a large overhead door and a smaller service door. The overhead door did not have a handle on the outside. The small service door dragged on the ground making it difficult to open. The service door was held shut with a bar in between two concrete blocks secured with a padlock and a wedge at the bottom. Doug Sr. tried the service door and found it locked. He did not know whether the overhead door was locked since the door did not have a handle on the outside and he was physically unable to lift the door. Doug Sr. pounded on the doors looking for Michael. No one came to the door but there was loud music coming from inside the shop.

¶ 8        Douglas Oram Jr. arrived with his own set of keys to the shop and opened the front door. With the aid of a three-dimensional computer rendering of the shop, Doug Jr. walked the jury through the layout of the shop and the route he and his father took through the building as they made their way toward the back of the shop where the victims' bodies were located. Father and son walked through the building, eventually locating Michael's body in a chair with his head down and a large pool of blood underneath the chair. Doug Jr. directed his father to go back to the front of the shop to call the police. After directing his father back to the front of the shop, Doug Jr. ventured further into the shop area. He observed Jamie suspended in front of a blue Mazda with her clothing caught on the handle of a car jack that was underneath the vehicle. When paramedics arrived, both victims were cool to the touch and had no pulse.

¶ 9        Multiple members of the Joliet police force testified to the scene inside of the shop. Police found no signs of forced entry on any of the doors or windows. A locked bar secured the rear service door. To the west of the blue Mazda and Jamie's body was a workbench area extending along the west wall of the shop. There was blood on the west wall near the workbench area. Police recovered a pipe wrench with blood and hair on it from the workbench along the west wall by the Mazda.

¶ 10       Police also recovered the following: blood spatter on the Mazda and on the outside trunk of a late model Plymouth parked parallel and within 15 feet of the Mazda; a bloodstained sledgehammer in the trunk of the Plymouth; a bag of cocaine in the drop ceiling of the shop's front office; and a crack pipe on the floor of the shop. The rear overhead garage door off the alley was unlocked and had a handle on the interior for lifting.

¶ 11       Forensic pathologist, Dr. Michel Humilier, conducted autopsies of both victims. With respect to Michael, Humilier observed multiple external injuries to his head, including several

lacerations to the scalp exposing the skull. Michael's skull had extensive fractures on all sides. The toxicology report showed the presence of cocaine and its metabolite. Humilier concluded that Michael's cause of death was "cranial cerebral injuries due to blunt head trauma due to assault" and that he had been struck multiple times about the head.

¶ 12    Humilier's examination of Jamie revealed similar injuries. Multiple lacerations to Jamie's head exposing the underlying skull that was fractured in multiple places. Humilier also noted a laceration to Jamie's lower back. Her toxicology report revealed the presence of cocaine and its metabolite, and the metabolite of marijuana. Like Michael, her cause of death was "cranial cerebral injuries due to blunt head trauma due to assault." Humilier found that Jamie had been struck multiple times.

¶ 13    Leah Spalliero, Joshua Martin, and Felicia Carnes all testified to their experiences at the shop the day of the murders. Spalliero testified that Martin was her boyfriend. Spalliero and Martin were at the shop around 8:30 p.m. to find a replacement bolt for her blue Mazda. Michael let Spalliero and Martin in through the rear overhead door; they visited with Michael and Jamie in the shop area. Michael and Jamie were smoking crack cocaine. Defendant arrived at the shop around 9 p.m. Spalliero and Martin left the shop around 9:15 p.m. to look for a part for the Mazda, returning around 10 p.m. Upon returning, Martin went into the shop while Spalliero stayed in the car. Once Martin came back to the car, he told Spalliero that defendant was inside the shop "hiding" in a corner. Defendant's red mustang was still in the parking lot of the body shop.

¶ 14    Martin's testimony was similar to Spalliero's. Michael and Jamie were at the shop with defendant arriving later. Defendant knocked on the rear overhead door and Michael let defendant in. Martin and defendant introduced themselves. Michael and defendant were using narcotics in the shop. He and Spalliero left the shop to look for a part. They returned between 9:30 and 10 p.m.

- 4 -

and Michael let Martin in through the rear overhead door. Spalliero waited for Martin in the car. Defendant was still in the shop with Michael and Jamie. Carnes was also in the shop with her car. Martin and Spalliero left the shop for the night about 15 to 20 minutes later and did not return.

¶ 15     Carnes testified that at around 9:35 p.m., she took her car to the autobody shop for service. Upon arriving, she pulled her car up to the rear overhead door off the back alley and honked. Michael raised the overhead door, greeted her, and had her pull the car into the shop. Once inside, she saw defendant sitting on a metal chair. He assisted in directing her into the shop. Carnes exited her car with her young daughter and visited with Jamie in the shop area while Michael worked on the car. Defendant went to another part of the shop. Carnes did not see defendant again although Jamie and Michael still conversed with him while he was in the other part of the shop. Carnes also saw Martin come and go before she left around 10:48 p.m.

¶ 16     Michelle Rossi testified under a grant of immunity. Rossi used and sold crack cocaine in March 2016, regularly communicating with defendant about crack cocaine. She supplied defendant with crack cocaine on the afternoon of March 8, 2016. Later that day, defendant contacted Rossi looking for more. Rossi informed defendant she was unable to fulfill the request because she was on her way out of town. Defendant responded, "You are going to fucking make me go through Mike [Oram]." Rossi attempted to contact defendant numerous times in the early morning hours of March 9 but was unable to reach him. She found this very unusual.

¶ 17     Christine Barnett, defendant's mother, testified that at some point on March 9, 2016, defendant came to her home. He entered her home "pretty fast, almost like running in" and was acting very nervous. Defendant told Barnett, "mom, I think I'm going to be in big trouble and I need money." In addition to the money, he asked Barnett for the title to his car. Barnett gave defendant the six dollars in cash that she had and the title to his Mustang. She asked, "what did

you do, kill somebody?" Defendant did not respond. He hugged Barnett, told her he loved her, and said that he did not think she would see him for a long time. Defendant then left Barnett's house. Barnett acknowledged she had taken Vicodin and approximately six shots of Peppermint Schnapps that day. She did not recall defendant ever asking for the title to his car on prior occasions and had never known defendant to sell his cell phone. After the encounter with defendant, Barnett called her daughter, defendant's sister, Rebecca.

¶ 18        Rebecca testified that she left work and returned home after receiving the call from Barnett. When Rebecca arrived, the police were already there. Rebecca went to the Joliet police station and, while in an interview room in the presence of detectives, she received a call from defendant who asked her to meet him in Chicago Heights. He asked Rebecca for food and clean clothes. She asked defendant to tell her what happened at the shop. He was not willing to discuss it over the phone. Rebecca was aware of previous instances of defendant selling his phone and car in order to obtain more drugs.

¶ 19        Lieutenant Joseph Rosado testified that he and other officers arrived at the Star Motel in Chicago Heights at around 1:30 p.m. on March 10, 2016. When Rosado knocked on the door of defendant's room, announcing himself as law enforcement, defendant said he had a gun and a couple of bags of crack cocaine. Defendant told police he would come out of the room after he finished smoking the crack cocaine. Approximately an hour later, defendant exited the room on his own. Police did not find a gun. Defendant requested that detectives retrieve his black hoodie, jeans, and shoes from the hotel room. Detectives also recovered a black Jordan hat from the room. Defendant was transported to the Joliet police station.

¶ 20        Detectives interviewed defendant at the station. His video-recorded statement was played in court for the jury. Defendant told police he was sitting in the shop with Michael and Jamie

smoking crack cocaine. He knew Jamie through Michael because Michael picked her up whenever the two wanted to get high together. He did not care what happened to Jamie because she was a "crack whore." Once the trio ran out of crack cocaine, Michael called a drug dealer to obtain more. Defendant never saw the dealer as Michael completed the transaction outside of the shop. Approximately 30 seconds after the dealer departed, as Michael was breaking up his crack cocaine, someone started kicking on the back door and identified himself only as "me." Michael opened the door, and said, "Oh, fuck" asking, "what are you doing back?" Defendant believed that Oram had previously kicked the person out of the shop. He drew a diagram of the shop to help describe where all the individuals were located.

¶ 21　　　Detectives asked defendant to describe the man only known as "me," but defendant said he was unable to do so because he was only there for a few minutes. Detectives asked if defendant could estimate the man's age, defendant responded, "when I'm high on crack there is nothing I'm paying attention to other than you two trying to get me." Defendant estimated that the man was a middle aged, "black guy." Detectives asked if the man was a "big guy or a small guy[.]" Defendant said that he was bigger than defendant but smaller than the detectives. When the officer asked about the man's height, defendant responded that he was a little bit taller than Michael but was not sure because he was high on crack cocaine. Defendant later described the stranger as a black man, 30 to 35 years old, with a slender build, weighing between 175 and 185 pounds, and short hair with waves.

¶ 22　　　After Michael let the man in, he asked Michael to share his crack cocaine. Michael told the man no because he only had enough for himself and Jamie. The man then asked defendant, and he agreed to share. Defendant smoked crack cocaine out of the pipe and then handed it to the man.

The man took a hit and then started walking around pumping his chest. He saw the man bend down, pick up a wrench, turn around, and strike Michael in the head with the wrench.

¶ 23    Defendant, referring back to his drawing of the shop, pointed out where everyone was during the incident. He explained that after striking Michael, the man walked around the back of the chairs toward where he was sitting. Defendant said the stranger was coming after him. Still holding the crack pipe, he ran toward where Jamie was in front of the blue Mazda. He stumbled over some clutter, grabbing Jamie as he tried to gain his footing. The man continued toward defendant. Holding Jamie, defendant spun her around just as the man swung low hitting Jamie in the back. When the man hit Jamie, defendant "took off." Defendant drew the path he took during the entire incident. On the diagram, defendant drew a path that went from the group of chairs in the center of the room to the front of the blue Mazda where he and Jamie were, around the side and back of the car, then back around the group of chairs, along the far side of the Plymouth parked in front of the overhead door, and then out the overhead door. Defendant managed to escape with the crack pipe that the unidentified man smoked crack cocaine out of. The diagram memorializing the path of defendant's escape was presented to the jury. Defendant claimed that the entire episode happened in less than 10 seconds. Once he broke free from Jamie, he never looked back to see what was going on.

¶ 24    Defendant's first thought after escaping was to call the police, but he failed to do so because he was high on crack cocaine. Rather, he drove to a Chicago area drug spot to look for more crack cocaine and continue getting high. He left his cell phone with a person in Robbins, Illinois, as collateral for money to buy more crack cocaine. He went to his mother's house. He told her that he was "mixed up in some shit" and that he would be implicated in something bad that happened

at the shop. He told her he needed the title to his Mustang. According to defendant, his mother was drunk "as she always is."

¶ 25 Defendant then sold his Mustang to a car dealer in Chicago Heights for $650, using the proceeds to buy more crack cocaine and purchase a motel room in Chicago Heights. Defendant called his sister from the motel instead of the police because he still had a lot of crack cocaine in his possession. Defendant did not know that Michael and Jamie had died until he saw the reports on the news while at the motel. He was still getting high at the motel when police arrived and that is why he did not come out of his room right away. He wanted to finish his remaining crack cocaine.

¶ 26 Detectives asked defendant how he was able to escape the shop with the crack pipe. He told them that when he is smoking crack his pipe is his "baby." Detectives then asked where the pipe was noting that it likely contained forensic evidence that could identify the mystery man. Defendant replied that he had thought about the mystery man using the pipe and that his saliva may have been on the pipe. Nonetheless, defendant discarded the pipe on the ground somewhere in Chicago Heights. Detectives also asked why defendant did not make an anonymous call from a pay phone to police. Again, defendant relied on the fact that he was high on crack cocaine.

¶ 27 Independent forensic consultant and bloodstain pattern analyst, Paul Kish, examined defendant's black tee-shirt, black hooded sweatshirt, jeans, and black Jordan hat using high intensity illumination to detect potential blood stains. Following his analysis, Kish recommended further testing on select representative stains. The selected stains from the tee-shirt contained a mixture of deoxyribonucleic acid (DNA) profiles from at least three people, one of which matched Jamie. The remaining profiles were deemed potentially incomplete and unsuitable for comparison. The samples taken from the black hooded sweatshirt contained the DNA profiles of at least two

people, one matched Jamie. The other minor profiles that were present were deemed potentially incomplete and unsuitable for comparison. An analysis on the samples from the jeans showed a single DNA profile matching Jamie.

¶ 28    Kish identified what appeared to be bloodstains on the underside of the brim of defendant's hat. DNA analysis of the sample showed a mixture of at least two people, one of which matched the DNA profile of Jamie while the other minor profiles were deemed potentially incomplete and unsuitable for comparison.

¶ 29    Kish opined that the stains on defendant's, tee-shirt, sweatshirt, jeans, and hat were spatter-type stains indicating that the articles of clothing were in close proximity to spatter producing events. Specifically, defendant's jeans were in close proximity to Jamie during the spatter producing events. Kish could not provide a precise measurement in terms of proximity, stating that it "would be close enough to where we are actually seeing spatter being produced. They can be close, in the same general area, very tight to where she is located."

¶ 30    Based on Kish's examination of the bloodstain pattern evidence, Michael was never upright or ambulatory while bleeding. Michael was seated in the chair where he was found while he was assaulted, and "the spatter producing events began and ended where he was located." Similarly, the bloodstain pattern evidence indicated that Jamie was not ambulatory while bleeding and she was in the position she was found at the time her blood was spattered "essentially very near to the ground, partially suspended on the jack pole."

¶ 31    A latent fingerprint examiner testified that she examined the sledgehammer, the pipe wrench, and the silver T-handle from the trunk lid of the Plymouth. There were no latent fingerprints suitable for comparison on any of these items.

¶ 32    The defense did not present any evidence.

¶ 33        During jury deliberations, the jury requested the handmade diagram defendant drew for police when he gave his statement. The jury also requested the three-dimensional imaging of the inside of the shop. Neither party objected to the jury seeing the exhibits, but defense counsel questioned the procedure in getting the exhibits to the jury. After consultation with the parties, the court decided to bring the jury back into the courtroom to view the exhibits. The parties were in the courtroom when the jury viewed the exhibits. After viewing the exhibits in the courtroom, the jury was again sequestered and resumed deliberations.

¶ 34        The jury found defendant guilty of both counts. The court sentenced defendant to life imprisonment.

¶ 35        Defendant appeals.

¶ 36                                II. ANALYSIS

¶ 37        Defendant argues he was convicted based on his presence at the crime scene, his opportunity to commit the crime, the presence of Jamie's blood on his clothing, and his "unusual actions" after the murders, including not immediately calling the police after he escaped from the shop. Defendant also argues that the trial court committed reversible error by allowing the jury to review evidence in the courtroom in the presence of the judge and counsel after deliberations had begun. However, defendant concedes in his reply brief that his contention concerning the jury's review of evidence after beginning deliberations is obviated by the decision in *People v. Hollahan*, 2020 IL 125091. We agree *Hollahan* obviates defendant's arguments on this point. Accordingly, we only address the argument regarding the sufficiency of the evidence.

¶ 38        The State contends that defendant's assertion that the evidence presented at trial is only circumstantial and merely amounts to proof of opportunity "grossly understates the evidence in this case."

- 11 -

¶ 39    "In determining the sufficiency of the evidence, this court considers whether, viewing the evidence in the light most favorable to the State, ' "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " (Emphasis in original.) *People v. King*, 2020 IL 123926, ¶ 52 (quoting *People v. Collins*, 106 Ill. 2d 237, 261 (1985), quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We apply this standard regardless of whether the evidence is direct or circumstantial, and circumstantial evidence meeting this standard is sufficient to affirm a criminal conviction. *People v. Jackson*, 232 Ill. 2d 246, 280 (2009).

¶ 40    In weighing the evidence, the trier of fact is not required to disregard inferences which naturally flow from the evidence before it, nor is it required to search out all possible explanations consistent with innocence, raising them to a level of reasonable doubt. *People v. Hall*, 194 Ill. 2d 305, 332 (2000). We will not set aside a criminal conviction unless the evidence is so improbable or unsatisfactory as to create reasonable doubt of defendant's guilt. *Collins*, 106 Ill. 2d at 261.

¶ 41    Circumstantial evidence is proof of facts or circumstances that give rise to reasonable inferences of other facts tending to establish guilt or innocence of a defendant. *People v. Saxon*, 374 Ill. App. 3d 409, 417 (2007). When relying on circumstantial evidence, the State is not required to show that the facts or circumstances proved exclude every reasonable theory of innocence. *People v. Davis*, 278 Ill. App. 3d 532, 539 (1996) (citing *People v. Bryant*, 113 Ill. 2d 497, 507-12 (1986)).

¶ 42    In this case, we find that a rational trier of fact could have found defendant guilty of first degree murder beyond a reasonable doubt. While, the State's case is largely circumstantial, a case built on circumstantial evidence can be sufficient to support a guilty verdict. *Jackson*, 232 Ill. 2d at 280. We reject defendant's contention that he was convicted based merely on his presence at the crime scene and his opportunity to commit the crimes. Defendant ignores his actions after

- 12 -

escaping the shop unscathed while attempting to minimize the blood spatter evidence and other physical evidence. His entire defense revolves around a mystery man committing the murders. The jury was in the best position to determine the credibility of this theory and was not required to ignore the inferences that naturally flowed from the evidence to elevate defendant's theory to reasonable doubt. *People v. Sutherland*, 223 Ill. 2d 187, 233 (2006).

¶ 43    After witnessing the gruesome bludgeoning of Michael and outrunning Jamie to avoid a similar fate, defendant did not contact police to report the incident. Rather, he went to obtain more crack cocaine before going to his mother's home where he asked for money and the title to his Mustang. He told her he loved her and that she would not see him for "a long time." He then sold his Mustang and used his phone as collateral in order to purchase even more crack cocaine and a motel room. He also discarded physical evidence that he acknowledged could have been instrumental in corroborating his story. Once police arrived at the motel, defendant refused to exit the motel room stating that he had a gun, and he would come out when he had finished his crack cocaine. The jury viewed the interrogation video wherein defendant stated he was able to complete transactions for money to secure more crack cocaine. When detectives asked why he could not be bothered to make an anonymous call from a pay phone to inform law enforcement of the incident and help his seriously injured friend, defendant relied on the fact that he was high on crack.

¶ 44    Moreover, the physical evidence directly contradicts defendant's version of events. The blood spatter evidence on the underside of the brim of his hat and on the right side of his body are at odds with defendant's contention that he was not near Jamie when the mystery man began bludgeoning her in the head. If defendant's version of events is to be believed, there should be no blood spatter on his right side nor on the underside of the brim of his hat. However, that is not the case.

- 13 -

¶ 45        Defendant also contends that if he committed the murders there should have been more blood on him than the "few drops" identified by Kish. After reviewing the photo evidence of defendant's clothing, there are more than a "few drops" of blood on the clothes he was wearing during the incident. While the amount of blood droplets tested for DNA profiles amounts to only a few drops, Kish circled numerous blood droplets on defendant's clothing. The amount of droplets circled does not include the totality of blood on defendant's clothing. Defendant also argues that the absence of Michael's blood on his clothing corroborates his version of events. Stating definitively that Michael's blood was not on his clothing is an overstatement of what the DNA results actually revealed. There were multiple profiles found on defendant's clothing of which Michael could not be excluded but the selected samples were inadequate to confirm whose blood it was.

¶ 46        Defendant relies on *People v. Dowaliby*, 221 Ill. App. 3d 788 (1991), arguing the State was required to show that he was the only person who had the opportunity to commit the double murder. We reject this analogy as the facts in this case and *Dowaliby* stand in stark contrast to each other.

¶ 47        In *Dowaliby*, the victim was the seven-year-old daughter of the defendant. *Dowaliby*, 221 Ill. App. 3d at 790. The State's case revolved around the fact that the defendant was the only one who had the opportunity to commit the murder. *Id.* The State's case consisted of facts demonstrating that no intruder could have committed the murder and that it was not possible that the victim wandered out of the house late at night because there was no dirt or mud on her feet and the doors at the house were locked. *Id.* The defendant also made several strange and contradictory statements after the victim went missing. *Id.* at 799-800.

¶ 48 Aside from the evidence related to the absence of any intrusion at the victim's home, and other evidence regarding the circumstances surrounding the victim's disappearance, the State presented a single witness who testified to witnessing a dark-colored car near the location where the victim's body was later discovered. *Id.* at 800. While the headlights were on, the witness saw the head of a person in the driver's seat and the profile of a large nose. *Id.* When shown a photo lineup, the witness stated that defendant's nose structure looked similar to the profile nose structure of the person he saw. *Id.*

¶ 49 The appellate court reversed the defendant's conviction because, unlike here, it was based on "doubtful, vague, and unreliable identification testimony," and there was no forensic evidence establishing a link between the defendant and the murder. *Id.* at 800-01. Moreover, there were *specific* persons, such as the victim's grandmother, who could have just as easily been guilty of the offense as the defendant. *Id.*

¶ 50 For reasons that are obvious, *Dowaliby* does not apply here. The circumstantial evidence in this case amounts to more than just proof of opportunity. Defendant admits to being at the scene of the crime and blood of one of the victims was present on his clothing, with profiles of at least one other individual present. We know for certain that he was in close proximity to Jamie at the time she was bludgeoned in the head. Defendant's conduct after the incident in failing to call police, selling his phone and car, going on a crack cocaine binge for nearly two full days before being tracked down in a motel room in Chicago Heights, and the conversation with his mother, that the jury may have viewed as a tacit admission, are all facts by which a rational trier of fact could find defendant guilty beyond a reasonable doubt.

¶ 51 Despite defendant's claim the evidence is insufficient to convict, there was substantial circumstantial evidence of his guilt and under the applicable standard of review, the evidence in

this case was not "so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *Collins*, 106 Ill. 2d at 261. It cannot be said that when viewed in the light most favorable to the prosecution, "a rational trier of fact could not have found defendant guilty of first degree murder beyond a reasonable doubt." *Jackson*, 232 Ill. 2d at 284. Accordingly, the evidence is sufficient to sustain defendant's convictions for first degree murder.

¶ 52                                            III. CONCLUSION

¶ 53           For the foregoing reasons, we affirm the judgment of the circuit court of Will County.

¶ 54           Affirmed.