THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID DOWALIBY, Defendant-Appellant.

First District (3rd Division)   No. 1—90—2029

Opinion filed October 30, 1991.

Jenner & Block, of Chicago (Robert L. Byman, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Randall Roberts, David Cuomo, and Brian Clauss, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE CERDA delivered the opinion of the court:

Following a jury trial, defendant David Dowaliby (David) was convicted of first degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1) and concealment of a homicide (Ill. Rev. Stat. 1987, ch. 38, par. 9—

3.1) for the death of his seven-year-old daughter, Jaclyn. He was sentenced to consecutive terms of 40 years' imprisonment for first degree murder and five years' imprisonment for concealment of a homicide. David contends that (1) the evidence was insufficient to support his convictions and it was error to deny his motion for a directed verdict; (2) the trial court erred in instructing the jury; (3) the trial court erred in excluding evidence that should have been admitted; (4) the trial court erred in allowing prejudicial photographs and slides to be given to the jury for use during its deliberation; (5) the prosecutor committed reversible error during closing argument; (6) the cumulative errors denied him a fair trial; and (7) the judgment should be vacated and the indictment dismissed because the indictment was procured by false testimony before the grand jury. We reverse because as a matter of law the evidence was not sufficient to find David guilty beyond a reasonable doubt and it was error to deny his motion for a directed verdict.

In 1988, David and his wife, Cynthia, lived in a single-family dwelling house in Midlothian, Illinois. David's mother, Anna Dowaliby (Anna), owned the house and lived in an apartment in the basement. The basement apartment did not have its own doors for ingress and egress to and from the outside. David and Cynthia lived in the house with their daughter, Jaclyn, age seven, and their son, Davey, age four. Jaclyn was the daughter of Cynthia and her first husband, Jim Guess. David adopted Jaclyn after he and Cynthia were married.

Jaclyn was last seen alive on Friday, September 9, 1988. On September 9, 1988, David worked from 8 a.m. to 4 p.m., and arrived home at 5:30 p.m. He left at 6 p.m. to go bowling at the Anchor Bowl in Blue Island. He returned home from bowling around 9:20 p.m. Cynthia, Jaclyn, Davey, Anna and Michelle Goldrick, David's sister, were home. Goldrick left shortly after David arrived home. Jaclyn went to her room with a Christmas catalog and went to bed around 10:30 p.m. David, Cynthia and Davey sat in the family room watching television. David went to bed around 10:30 p.m. while Cynthia and Davey were still watching television. Cynthia watched television until 11:30 p.m. Before going to bed, she turned off the lights in the living room and checked the children. Jaclyn had fallen asleep with her overhead light on, which Cynthia turned off. Cynthia left the doors to the children's rooms open and her bedroom door ajar. She then went to sleep.

Anna left home that evening around 10:30 p.m. to go to Papacino's Restaurant in Oak Forest. Anna stated that she went out the back door of the house and checked to make sure that it was locked. Anna stated that in the past she had used both the front and back

doors, but in September 1988, she did not have a key to the front door. Anna did not return home that night.

On September 10, 1988, the Dowalibys' alarm clock rang at 7:30 a.m. Cynthia looked at the clock and asked David what was the day. When he told her it was Saturday, she turned off the alarm and went back to sleep. David was supposed to play golf that morning, but he also went back to sleep. At around 8 a.m. David was awakened by Davey. David got up and went to the living room, where he saw that the front door was open. He closed the door, sat down, and watched T.V. cartoons with Davey. When he heard Cynthia awake about 9 a.m., David brought a cup of coffee to her in the bedroom. Shortly afterwards, Cynthia asked if Jaclyn was awake. David told her "No," and Cynthia said she was going to wake her up. When Cynthia went into Jaclyn's room and saw that she was not there, Cynthia and David looked for her throughout the house.

David then suggested that Jaclyn may have gone outside, so they looked for her outside. They got in their pickup truck and drove around the neighborhood looking for Jaclyn. In the meantime, Anna came home for the first time since she had left around 10:30 p.m. Friday. When David and Cynthia returned home they discovered that one of the basement windows to Anna's apartment had been broken. They immediately called the Midlothian police. The transcript of the Midlothian police department tape shows that David made the phone call at 10:26 a.m.

The telephone company phone log indicated the following calls were made from the Dowaliby house on September 10, 1988:

| | | |
|---|---|---|
| 9:46 a.m. | Sylvia Borelli<br>(Cynthia's sister-in-law) | 1 minute |
| 9:52 a.m. | Susan Haseman home<br>(Jaclyn's friend) | 1 minute |
| 9:57 a.m. | James Guess home<br>(Cynthia's former husband) | 1 minute |
| 10:06 a.m. | Wag's Restaurant | 5 minutes |
| 10:25 a.m. | 411-Directory Assistance | 1 minute |
| 10:26 a.m. | Midlothian Police | 1 minute |
| 10:31 a.m. | Wag's Restaurant | 1 minute |

Donald Woodark, a Midlothian police officer, testified that on September 10, 1988, he made an initial investigation of a possible break-in and missing child. When Woodark arrived at the Dowaliby house, David let him in and told him that he believed that there had been a break-in and that his daughter was missing. Defendant took Woodark outside to show him the broken basement window. The wire screen in

front of the basement window had been ripped back, but was partially intact in its frame. Glass was lying around the outside area where the basement window was located.

Woodark also testified that while he was walking down the hall to Jaclyn's bedroom, he noticed a dresser with its drawers open. Inside Jaclyn's room, he saw clothes hanging out of the drawers, and clothes on the floor. The bedroom closet light was on and the window blinds were closed. The bed, which had no sheets on it, was pulled out at an angle. David and Cynthia told Woodark that they moved it when they were looking for Jaclyn. On the bed was an open suitcase with clothes in and around it. Cynthia told Woodark that it was one of Jaclyn's playthings. David and Cynthia said that the only thing missing was Jaclyn's bedspread.

David told Woodark that he found the front door open when he got up at 8 a.m. He said that he was positive he had closed and latched it before going to bed Friday night. David also told Woodark that he had installed a sliding bolt about three inches from the top of the door to prevent the children from leaving the house early in the morning. After sending out a missing person report, Woodark went back to the basement window area, where he picked up pieces of glass by their edges. He stated that he was looking for any blood or marks to indicate what was used to break the window. After examining the pieces of glass, Woodark put them back in approximately the same place where he had picked them up.

Woodark stated that Anna's bedroom, where the broken window was located, was dim and disheveled, but not ransacked. There were closed curtains in front of the broken window. Under the window was a metal rack with a cloth basket on top and two boxes underneath. Woodark testified that when he parted the curtains to look at the window, he observed an even layer of dust on the inside window ledge. Nevertheless, on his initial police report dated September 10, 1988, Woodark wrote that the method of entry was the broken basement window. In that report, he stated five times that entry was made through the broken window and he did not report that dust was on the window ledge. The first time Woodark mentioned the presence of dust was in a supplemental report written on September 27, 1988.

Hayden Baldwin, an Illinois State Police crime scene technician, testified that on September 10, 1988, he conducted a cursory exam of the exterior and interior of the Dowaliby house. He testified that Anna's bedroom was in disarray and unkempt. Inside the basement window that was broken, which was unlocked, he saw two cobwebs on each corner and a layer of dust on the window ledge. The window,

however, was unlocked. The curtains in front of the window were pulled back approximately one-third of the distance. Baldwin photographed the curtains, but not the cobwebs. He photographed the basement playroom and Jaclyn's bedroom, where there were open dresser drawers and a suitcase on the bed. He did not look into any other rooms.

Baldwin testified that there were smear marks on Jaclyn's bedroom door, but the prints were not suitable for lifting. There was no testimony that there was any attempt to find other fingerprints in Jaclyn's room. Although there were several smear marks on the front door to the house, none were suitable for lifting. There was no testimony about any fingerprints on the back door or the sliding glass door.

Although Baldwin used a high intensity light to examine the broken window area, no hair or fibers were found. The windows leading into the basement utility room were unlocked and had dust on them. On the outside, Baldwin found no shoe prints in the area around the windows.

On September 11, 1988, FBI Agent Steven Kashirsky examined the Dowaliby house. He found an unlocked basement window that looked toward the backyard. He also saw an unlocked basement window in the laundry-work storage room. Kashirsky also testified that he easily opened one of the unlocked windows. Kashirsky testified that from September 10, 1988, to September 14, 1988, law enforcement officers had complete access to the Dowaliby house. David voluntarily gave blood and urine samples, and written permission to take any and all medical records from the family.

Jaclyn's decomposed body was found on Wednesday, September 14, 1988, in an area that appears to be a thicket or brush in Blue Island, Illinois, approximately three miles from the Dowalibys' home. The body was found by Michael Chatman, who lives at the Islander Apartments in Blue Island. When he arrived in the rear parking lot of his home about 5:45 p.m., Chatman smelled a strong foul odor. When he looked in the weeds and bushes, he saw something wrapped in a covering. He took one step in, moved the bush back, and saw what appeared to be a small body, face up, one to two feet from the parking lot. There was a sheet covering most of the body, except for the arm and head. Chatman described the area as heavily overgrown with brush and six-foot weeds along the parking lot pavement.

Jaclyn's body was wrapped in a multicolored quilt when it was found. Her body was exposed from the upper torso to the top of her head. There was heavy maggot infestation on the upper torso and

head areas. There were no bruises to her head or face. She was not gagged. A rope was wound tightly around her neck twice, extending down the body and lying freely between her legs. The rope, which had no noose, was not knotted around her neck. There was no indication that any teeth had been knocked out or forcibly removed. Jaclyn's nails, which were partially painted with fingernail polish, showed some decomposition. A pair of white cotton panties were lying about one foot from Jaclyn's feet. They were clean and not rolled inside out. Baldwin testified that there were no visible shoe prints around the body.

On September 14, 1988, at 6:30 p.m., police officers Kashirsky and Eley were at the Dowaliby house when they learned that the body had been discovered. When Cynthia was told that Jaclyn's body had been found, she burst into tears and collapsed. When David returned home at 7 p.m., and was told what had happened, he sat down and cried.

Jennie Hahn, a forensic scientist at the Illinois State Police crime lab, testified that Jaclyn's blood type was Type O, which was the same blood type as Davey and Cynthia. David has Type A blood. Hahn testified that she did not find any bloodstains or semen on the panties found near Jaclyn's body, and did not test for sperm. On the back panel of the panties, there was a stain that was not blood or semen. No other chemical tests were conducted. There were no cuts or tears in the panties. Swabs taken from the vaginal and rectal cavities were negative, although blood was present. Fingernail clippings had Type O blood on them.

Hahn further testified that there were two hairs in the panties, a pubic hair and a head hair that was consistent with Jaclyn's head hair. The pubic hair could not be Jaclyn's because she was prepubescent. There were foreign fibers found in the panties. Due to its condition, Hahn was unable to perform chemical tests on the nightgown, which was moist and wet with debris, decomposed material, and maggots.

Hahn further testified that she recovered three hairs from the rope that was around Jaclyn's neck. Two were consistent with Jaclyn's hair, and the other was not consistent with Jaclyn's hair or the hair of any of the Dowalibys. The rope, which was 25 feet 9 inches long, and one-quarter inch in diameter, had frayed ends. Hahn also testified that there were two Type O bloodstains on Jaclyn's pillow. They were different in color intensity, indicating that one was older than the other. There were no bloodstains, sperm, or semen on the mattress pad. Hahn stated that she found five bloodstains on Jaclyn's bedspread. She could not determine if the stains were human or ani-

mal blood or the age of the stains. There were no traces of blood on the two sheets identified as coming from Jaclyn's bed or on the two pillowcases that were on Jaclyn's bed.

The Dowalibys owned two vans, a truck and a light blue Chevrolet Malibu automobile. Hahn examined several hairs from the Malibu trunk mat. After visually comparing Jaclyn's head hair with the hair from the car mat, Hahn could not exclude them as coming from Jaclyn. Hahn testified that she never visually compared the hair from the mat or the hairnet found in the trunk with Cynthia's hair. Hahn explained that it is not unusual to have hair from another family member on a person's clothing or other personal articles. Hahn also stated that there were no bloodstains on the Malibu trunk mat.

Ralph Meyer, an Illinois State Police forensic microanalyst, compared fibers from the bedspread found on Jaclyn's body and the Malibu trunk mat. He observed no fiber transfer between the two objects. Meyer also compared 17 hairs from the trunk mat. Five of the hairs possibly came from Cynthia, one hair possibly from David, and one hair possibly from Jaclyn. Three hairs were inconclusive, and three were not compared (one was from an undetermined body part, and two were common, featureless hairs).

Ralph Meyer testified that based on radial marks, concentric breaks, and stress marks in the glass from the broken window, the force to break the window came from the outside.

Dr. Robert Stein, the Cook County medical examiner, performed an autopsy on Jaclyn's body on September 15, 1988. Dr. Stein testified that Jaclyn's body was markedly decomposed, with thousands of maggots present. Considering the temperature and humidity, the decomposition was consistent with being dead for 5½ days. Due to decomposition, it was difficult to determine whether the body was in the same place for the entire time since death.

Complete body X rays showed no evidence of any bullets or fractures. Dr. Stein testified that he could state unequivocally that there was no injury to her head. There were no bruises on her arms or hands, no rope burns or marks on her wrists, and no signs on her arms that she had been bound. There were no bruises on her torso and no binding or tie down marks on her body. There were no scratches on her buttocks or back. There were no marks on her legs indicating that she had been bound or tied. There were no bruises on her legs, no mud or excess dirt on her feet, and her knees were clean. Dr. Stein testified that the cause of Jaclyn's death was ligature strangulation. Due to decomposition, Dr. Stein could not rule sexual molestation in or out, but Jaclyn's nightgown had not been torn.

Holly Deck, the Dowalibys' next door neighbor, testified that on September 9, 1988, she saw laundry, including a little girl's sheet with a picture of a girl with long blond hair, hanging on the Dowalibys' clothesline. Later that evening, Deck was watching television when her four dogs started barking and growling at her side door, which was the closest to the Dowaliby home. They continued barking from about 11 p.m. to midnight, going back and forth to the front and side doors. Deck testified that this was very unusual. The dogs usually barked like that when a stranger was around. Deck also stated that the dogs liked the Dowalibys.

Deck further testified that she went to bed about 1:30 a.m., and got up about 2:10 a.m. to go to the bathroom. After going to the bathroom, she went to the kitchen to get a glass of water. She looked out the window and saw that all the Dowaliby vehicles were gone except for the blue Malibu. She stated that Cynthia usually drove that car, and it was very rare to see David driving it. The car was parked overhanging the Dowaliby driveway approximately one foot, which was unusual.

Brian Anderson, a neighbor, testified that he saw the Dowalibys' blue Malibu hanging over their driveway at 8 a.m. on September 10, 1988, in the same position he saw it the night before.

It was stipulated that FBI Agent Jonathan Newcombe spoke with Colleen Jones-Godin, the Dowalibys' neighbor, on September 11, 1988. Newcombe would testify that Jones-Godin told him that she believed Jaclyn had a good family life and never heard her complain of any type of mistreatment from her parents.

Jeffrey Koleczyk, a Dowaliby neighbor, testified that before September 10, 1988, he saw Davey playing with ropes. He identified the rope found around Jaclyn's neck as the same type of rope with which Davey played, and about the same length, which was more like a clothesline than a jump rope. He stated that he did not see Davey playing with rope after Jaclyn was missing. Koleczyk, however, could not identify the rope that was found around Jaclyn's neck as the rope that he saw used by Davey.

Everett Mann testified that he returned to his apartment at the Islander Apartments in Blue Island about 2 a.m. on September 10, 1988. When he arrived, Mann was unable to find a parking space in front of his building so he drove down the east driveway to the rear parking lot. When he reached the rear parking lot, he made a U-turn into the second parking space from the driveway, which was directly behind his building.

To his right, Mann saw a set of headlights go on near the middle driveway, which was close to where Jaclyn's body was later found. Mann stopped his car and looked at the lights. He observed the car slowly pulling forward, going in a southerly direction, out the middle driveway. It appeared to be a dark-colored, late model mid-size car, possibly a late 1970's Malibu. Mann saw one head inside the car near the front about where the driver would sit. He saw the profile of a large nose, which appeared to be that of a male. Mann completed his parking, went into his apartment, and went to sleep. Mann stated that a number of the lights in the back of the buildings were not working. On September 16, 1988, Mann told police that there was one street lamp working near his building and nothing in the middle, so that it was dark there. There were lights on the far end of the parking lot near the fire station.

Mann testified that the Malibu was 75 yards away from him when he saw it. Further, Mann testified he saw only a side view of the individual, not a full frontal view. He told police that he saw only a silhouette. Mann also told the police that he was not sure whether the person that he saw was white or African-American.

The evidence at trial consisted of nearly 200 exhibits and over 40 witnesses. At the end of all the evidence, the trial court directed a verdict in favor of Cynthia but denied David's motion for a directed verdict. We agree with David's contention that the trial court erred in denying his motion for a directed verdict.

■■ The State's argument centers on David's opportunity to murder Jaclyn, his behavior and statements, and the identification of David's nose structure and the Dowalibys' Malibu. Specifically, the State contends that David and his wife, Cynthia, were the only people with the opportunity to kill Jaclyn since they, Jaclyn, and their son, Davey, were the only people in the house after Anna left around 10:30 p.m. on September 9, 1988. The State emphasizes that no intruder could have entered the house during the night because there were no credible signs of unlawful entry. Additionally, the State argues that it was not possible that Jaclyn walked out of the house unnoticed during the night and was abducted by a stranger because the front and back doors were locked and there was no excess dirt or mud on the soles of Jaclyn's feet. Opportunity alone, however, is not sufficient to sustain a conviction unless the State can prove beyond a reasonable doubt that no one else had the opportunity to commit the crime. *People v. Jenkins* (1983), 117 Ill. App. 3d 33, 37, 452 N.E.2d 867, 873; *People v. Howard* (1979), 74 Ill. App. 3d 870, 877, 393 N.E.2d 1084, 1090.

■ Here, Anna Dowaliby had the opportunity to murder Jaclyn. Anna testified that she left her home around 10:30 p.m. on the night in question and went to a local lounge. Michael Healy testified that he saw Anna sometime after midnight "partying with some friends" at the El Dorado Restaurant. Healy further testified that he and Anna left the El Dorado Lounge together "drunk" at approximately 4:30 a.m. and went to Healy's apartment. Healy and Anna spent the night together at Healy's apartment. Healy drove Anna to the El Dorado Restaurant at approximately 9:15 a.m. the next morning.

It is plain that Anna's whereabouts are unaccounted for between 10:30 p.m., the time she left the Dowaliby home, and sometime after midnight, when Healy testified that he saw her at the El Dorado Restaurant. During this unaccounted for time frame, there are no witnesses to Anna's whereabouts. The record reveals only that Anna told investigators that she left the Dowaliby home around 10:30 p.m. and drove to Papacino's Restaurant. Accordingly, Anna had the opportunity to murder Jaclyn. In addition, it is clear that Cynthia had the opportunity to commit the crime.

The State argues that defendant and his wife Cynthia were the only individuals with an opportunity to murder their daughter. Therefore, the State contends, one of them must have murdered her. In *People v. Lopez* (1979), 72 Ill. App. 3d 713, 717, 391 N.E.2d 104, 108, identical twins were observed by eyewitnesses sitting in a parked car. One of the twins got out of the car, crossed the street, and shot the victim. The assailant returned to the auto, and the two brothers left the scene. Both brothers were convicted of attempted murder. On appeal, their convictions were reversed because the State was unable to prove which one of the twin brothers shot the victim. Therefore, neither brother could be convicted as a principal. The court also found there was insufficient evidence to support a conviction under the theory of accountability. The court held that

> "mere presence at the scene of a crime coupled with flight from the scene of a crime is insufficient to establish accountability." *Lopez*, 72 Ill. App. 3d at 716-17, 391 N.E.2d at 108.

Moreover, an intruder would have had an opportunity to commit the crime. The State claims that the police found no signs of forced entry after they examined all the basement and first-floor windows. The record indicates, however, that the only window police checked for signs of forced entry was the broken basement window. In Officer Woodark's initial report of September 10, 1988, he did not report that dust was on the broken ledge, and he reported that the method of entry into the house was through the broken basement window. Officer

Baldwin testified that the windows in the basement utility room were unlocked and that there were other unlocked basement windows, some of which did not have screens. There is no evidence that Baldwin inspected any of those windows for signs of forced entry. FBI Agent Steven Kashirsky investigated the Dowaliby house on September 11, 1988. He found an unlocked basement window that looked toward the backyard and an open window in the basement laundry room. Kashirsky testified that he easily opened one of the unlocked windows.

Under the circumstances, we conclude that the State's contention that the record is sufficient to support David's conviction because he had the opportunity to commit the crime is untenable. There clearly were others who had the opportunity.

The State also argues that several of David's statements to the police prior to and after the discovery of Jaclyn's body are crucial admissions of David's guilt. The State refers to statements reportedly made by David under the following circumstances:

(1) David initially told law enforcement officials that he kissed Jaclyn good-night in the evening of September 9, 1988. David later told other investigating officers that he did not see her that night.

(2) During interrogation by law enforcement officials prior to the discovery of Jaclyn's body, when David was asked if he could find Jaclyn, he responded: "[G]ive me two days, give me two weeks. I'll follow the leads. I'll find her."

(3) During interrogation by law enforcement officials prior to the discovery of Jaclyn's body, when David was asked if he knew where Jaclyn was, he responded: "I didn't do it."

(4) After being told by law enforcement officials that Jaclyn's body had been found, David exclaimed, "In a field? *** Is she alive? *** You're lying? *** I guess you think I ought to cry?" (Parenthetically, we note here that Jaclyn's body was found in a thicket or brush rather than a field.)

(5) On the day before Jaclyn's body was found, Colleen Jones-Godin spoke with David. After she gave her condolences, David responded by saying, "Yeah. It was really hard at first, but it gets easier day by day."

(6) When Godin-Jones spoke to David on September 20, 1988, about the police search at the Dowaliby house, David responded by saying "Only in America. They told me that they ain't got nothing on me."

■ We conclude that when David's statements are placed in the context of the investigation and given reasonable interpretations they cannot singularly or cumulatively be construed as admissions of guilt. We also conclude that the statements do not corroborate or give credence to any evidence linking David to the crime.

The State next argues that David was identified by Everett Mann as the person he saw at the location where Jaclyn's body was found. Mann testified that at 2 a.m. on September 10, 1988, from 75 yards away, he saw a dark-colored car in the rear parking lot of the Islander Apartments near the location where Jaclyn's body was later discovered. When the car's headlights went on, Mann looked and saw a head inside the car near the front where the driver would sit. Mann stated that he saw the profile of a large nose. He was not sure whether the person was white or African-American.

On September 16, 1988, after being shown five front view and full-faced photographs, including one of David, Mann stated that David's nose structure looked similar to the profile nose structure of the person he saw on September 10, 1988. We note that for some unexplained reason, David's photo was 30% larger than the other photos in the array. On September 28, 1988, the police showed Mann photographs of the Dowalibys' two vans, truck, and light-blue Malibu car. Mann told the police that the Malibu, not the two vans and truck, most resembled the car he saw on September 10, 1988. Although the Dowalibys' Malibu was light blue and Mann described the car he saw on September 10, 1988, as dark-colored, Mann explained that a light blue car could have appeared dark because the lighting in the parking lot was not very good on September 10, 1988.

■ A conviction cannot be sustained on doubtful, vague, and unreliable identification testimony. (*People v. Wehrwein* (1989), 190 Ill. App. 3d 35, 39, 545 N.E.2d 1005, 1008; *People v. Ash* (1984), 102 Ill. 2d 485, 494, 468 N.E.2d 1152, 1157.) At best, Mann's identification was a vague identification of a nose profile. Mann, however, was never shown a profile photo of David, but only a frontal and full-faced view. Moreover, Mann never identified David or his nose in court. Mann was unable to state whether the man in the car was white or African-American, young or old, had or did not have a mustache, was bald or had a full head of hair, or wore glasses, or had other identifying characteristics. We, therefore, conclude that Mann's identification testimony was doubtful, vague, unreliable and of no probative value.

■ The State also maintains that the series of phone calls on September 10, 1988, were indicative of defendant's attempts to mislead the police regarding Jaclyn's disappearance. However, we believe

the phone calls could have been reasonable actions on the part of the parents.

Although there are many unanswered questions, after viewing the evidence in a light most favorable to the State, we conclude that the totality of the evidence is not sufficient to prove David guilty of Jaclyn's murder or concealment of a homicide. The State failed to introduce sufficient evidence to directly or indirectly link David with Jaclyn's murder. It did not prove that David was the only person who had the opportunity to murder Jaclyn. Either Cynthia or Anna could have murdered Jaclyn without David's knowledge, or an intruder could have entered the house on the evening of Jaclyn's disappearance and murdered Jaclyn. Moreover, the State's only identification testimony was doubtful, vague and unreliable, and cannot reasonably be expected to link David with the crime. In addition, the various statements made by David, giving them their most sinister cast, do not provide the kind of evidence upon which a conviction may be based.

We note that the probative evidence against David is no greater than the probative evidence against codefendant Cynthia. The trial court determined that there was insufficient evidence to convict Cynthia, and directed a verdict in her favor at the close of the evidence. We conclude that the trial court erred in denying David's motion for a directed verdict which was also heard at the close of the evidence.

Accordingly, David Dowaliby's convictions of first degree murder and concealment of a homicide are reversed because as a matter of law the evidence was not sufficient to find him guilty beyond a reasonable doubt.

Reversed.

RIZZI AND GREIMAN, JJ., concur.