NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210700-U

NO. 4-21-0700

IN THE APPELLATE COURT

FILED
June 27, 2022
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| BRADLEY WEBSTER SIMMONS, | ) | No. 20CF444 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | William G. Workman, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Presiding Justice Knecht and Justice Turner concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, holding that (1) the evidence at the discharge
hearing was sufficient to prove beyond a reasonable doubt that defendant was not
not guilty of the charged offenses and (2) the appellate court lacked jurisdiction to
consider defendant's contentions of error concerning the trial court's finding of
unfitness.

¶ 2    Defendant, Bradley Webster Simmons, was charged with unlawful possession of
a weapon by a felon, unlawful possession of firearm ammunition by a felon, and obstructing a
peace officer. The trial court found defendant unfit to stand trial and placed him in the custody of
the Department of Human Services (DHS) for treatment. Defendant failed to attain fitness, and a
discharge hearing was held. The trial court found defendant not not guilty of the charged
offenses and remanded him to the custody of DHS for further treatment.

¶ 3        Defendant appeals, arguing (1) the State presented insufficient evidence at the discharge hearing to prove beyond a reasonable doubt that he was not not guilty of the charged offenses; (2) the trial court abused its discretion in finding him unfit to stand trial where it relied solely on a report that failed to explain how he was unfit and failed to ensure his presence at the fitness hearing or properly waive his absence; and (3) the trial court erred in denying defendant his right to a jury determination of his fitness. We affirm.

¶ 4                                    I. BACKGROUND

¶ 5        On June 1, 2020, defendant was charged with unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2020)), unlawful possession of firearm ammunition by a felon (*id.*), and obstructing a peace officer (*id.* § 31-1(a)). The public defender was appointed to represent defendant.

¶ 6        On June 19, 2020, the matter was set for a preliminary hearing. Defendant refused to leave his cell to attend the hearing via closed circuit television, and the matter was continued.

¶ 7        On June 25, 2020, defendant, acting *pro se*, filed an "Emergency Injunctive Medical Request for Medicine" requesting that the trial court direct the jail to prescribe him " 'nascent iodine.' " He stated he needed this medication to "maintain optimal fitness for trial." During the pendency of the proceedings, defendant, again acting *pro se*, filed several other documents requesting that he receive "nascent iodine" in jail.

¶ 8        On June 26, 2020, defense counsel and the State appeared for a status hearing. Defendant was not present. The trial court stated it had been advised by court security that defendant again refused to leave his cell. Defense counsel asserted he had spoken to defendant a couple weeks prior to the hearing and another assistant public defender had also spoken with defendant. Defense counsel asserted that the public defender's office had a *bona fide* doubt as to

defendant's fitness to stand trial. Defense counsel filed a written petition that day requesting that the court appoint an expert to determine defendant's fitness.

¶ 9        The trial court granted defense counsel's petition and entered an order appointing Dr. Terry Killian to examine defendant and determine his fitness to stand trial. The trial court noted that, at the first hearing, jail officials could not move defendant from his cell to the room for closed circuit hearings without jeopardizing defendant's safety and the safety of corrections officers. The court stated defendant again refused to leave his cell and had filed a document in which he "allude[d] to mental health issues."

¶ 10        On July 28, 2020, Dr. Killian filed his report. In the report, Killian stated he attempted to interview defendant in his cell at the jail but defendant sat behind a half wall in his cell and would not speak to Killian. After several unsuccessful attempts to speak to defendant, Killian just observed defendant in his cell. Killian then interviewed other inmates at the jail, periodically checking on defendant to observe him. Killian spoke with an inmate services assistant coordinator at the jail who told him that defendant was delusional, as he believed his blood was poisoned by "some sort of metal." She told Killian this had been a "consistent theme" during defendant's many prior incarcerations at the jail. She also said defendant had been found unfit five years earlier in Champaign County and was sent to a treatment center. However, Killian did not have any records regarding that case or defendant's treatment.

¶ 11        Killian diagnosed defendant with "probable schizophrenia," though he noted he did not have "a lot of information on which to base a diagnosis." Killian opined, within a reasonable degree of psychiatric certainty, that defendant was not fit to stand trial "on the basis of his apparently severe psychotic illness which appears to render him incapable of rationally

- 3 -

assisting in his own defense." Killian found defendant could likely be restored to fitness within one year with a course of antipsychotic medication.

¶ 12        On August 3, 2020, a fitness hearing was held. Defendant was not present in the courtroom. The trial court indicated defendant had refused to leave his cell to appear via closed circuit television. The court stated it intended to proceed with the fitness hearing without defendant's presence, and defense counsel stated he had no objection. The court indicated it had reviewed Dr. Killian's report. The parties stipulated that the only evidence to be presented was the contents of the report. The court found defendant unfit to stand trial based upon the parties' stipulation to the contents of the report and the court's own review of the report. The court found a substantial possibility existed that defendant would be able to attain fitness within a year if provided a course of treatment. The court placed defendant in the custody of DHS in an inpatient secure setting.

¶ 13        On September 30, 2020, defendant filed several letters in a *pro se* capacity. In one of the letters, defendant argued the trial court improperly found him unfit when he was not present at the fitness hearing. Defendant asserted he had the right to attend all fitness hearings. In another letter, defendant requested that a guardian *ad litem* be appointed to argue for (1) defendant's fitness for trial, (2) a jury determination of defendant's fitness, (3) a second psychological evaluation performed by a specified individual, and (4) "the point that [defendant] is capable of answering the court's questions." Defendant subsequently retained private counsel.

¶ 14        The court held two 90-day review hearings on the fitness determination. At each hearing, the court found defendant remained unfit based on reports submitted by DHS indicating defendant had been diagnosed with schizophrenia and remained unfit. Defendant did not attend the hearings, but his counsel was present.

¶ 15          On August 3, 2021, a letter from a hospital administrator at DHS was filed. The letter stated DHS personnel believed there was not a substantial probability that defendant would attain fitness within one year from his admission. A progress report attached to the letter stated defendant's symptoms of psychosis hindered his ability to attain fitness. The report stated he was noncompliant with prescribed treatment and was on court-ordered medication. The report indicated defendant had knowledge of basic court proceedings and an understanding of the charges but lacked the capacity to assist in his own defense. The report stated defendant might be able to attain fitness "within an extended time frame."

¶ 16          The trial court held a discharge hearing on October 26, 2021. Prior to the hearing, the court considered a DHS progress report dated October 13, 2021, that was submitted by the parties. The report indicated defendant remained unfit to stand trial but stated he might attain fitness within an extended period of time. The court found defendant remained unfit to stand trial at that time. The court also took judicial notice of defendant's 2018 felony conviction for aggravated battery.

¶ 17          The State presented the testimony of Detective Bryan Hanner. Hanner testified he was working as a patrol deputy on May 29, 2020, at 9:45 a.m. At that time, he proceeded to Route 66 near Lexington, Illinois, after officers had received reports of a potentially armed trespasser on the railway line. Hanner was driving a marked squad car. While Hanner was driving to that area, a motorist flagged him down and told him there was a man standing in the road with a rifle in his hands near the Brandt agricultural facility.

¶ 18          Hanner proceeded to the area and saw an individual standing in the road holding a long, narrow object in his hands. The individual was near the intersection of Route 66 and Orange Street. Hanner described the person in the road as a "larger-built male" who was wearing

dark clothing. Hanner could not identify the man's race because of the distance. Hanner could not discern what the man was holding, but he assumed it was a long gun or rifle case based on his conversation with the motorist.

¶ 19        Hanner then stopped his vehicle, turned his emergency lights on, and exited the squad car armed with a shotgun. He stopped his car a long distance from the man because he believed the man was armed with a long gun, which would be able to engage him at a much greater distance than a handgun. Hanner began shouting commands at the individual, telling him to get down on his knees and put his hands up. Hanner could tell the man heard him because "[h]e was starting to move, look for a way out." The interstate highway was on one side of the road. The man ran in the opposite direction of the interstate toward the Brandt facility. He was still holding what looked like a long gun as he ran away.

¶ 20        Hanner reported over his radio that a subject in dark clothing was running away from him on foot in the direction of the Brandt facility. Hanner subsequently spoke with Brandt employees, who told him they had seen a large, white male wearing a camouflage jacket and a green backpack and carrying a tan rifle case.

¶ 21        Hanner testified police units began spreading out in the area. Hanner and another officer first searched culverts, ditches, outbuildings, and vehicles in the area around the Brandt facility. Other units did the same thing in their search areas. The units then established a "perimeter," which Hanner described as "a pocket cordoned around an area to contain any subjects that might be in it until those areas [could] be cleared and that person located." An individual was eventually located within the perimeter created by the officers. Hanner recognized the individual, later identified in court as defendant, from prior contacts. Defendant

was wearing tan pants and a plaid shirt and appeared to be dirty and disheveled. He was not carrying anything when he was apprehended.

¶ 22        Hanner testified that when he initially saw the man in the road, he was not able to recognize him as defendant. Hanner estimated that officers apprehended defendant approximately 80 to 90 minutes after he initially saw the man in the road. Defense counsel asked Hanner if at any point he saw the "individual [he was] looking for" wearing a camouflage jacket or a green backpack and Hanner said he had not.

¶ 23        Hanner identified a map of the area where the incident occurred, which was introduced into evidence. The map depicted the intersection of Route 66 and Orange Street, where Hanner initially saw the man in the road. The map showed several buildings directly east and south of the intersection, which Hanner stated was the Brandt facility. The map also showed an open area to the east of the Brandt facility and a water treatment plant to the east of the open area. There was a building further south, which Hanner testified was part of Martin Sullivan Implement.

¶ 24        Detective Aaron King testified that he assisted officers in an area search on the morning of the incident. King was advised that the officers were searching for a white male who was approximately 20 to 30 years old, wearing a camouflage jacket, and carrying a tan gun case. The officers were notified that a Martin Sullivan employee had observed a man in a field to the east of the Martin Sullivan facility walking south toward Lexington. King drove to the area and observed a white male walking south. Several officers ran toward the man yelling for him to stop. He looked at them and then turned and ran to the south. King drove closer to the man and told him to stop. After running another five to ten seconds, the individual stopped, got on his hands and knees, and put his hands on his head. He said, " 'Why are you guys chasing me[?] I

am just going for a walk.' " The man was not wearing a camouflage jacket. King did not observe him carrying or throwing anything. King identified defendant as the man he chased on the morning of the incident.

¶ 25 Trooper Benjamin Reichard testified that he participated in an area search north of Lexington at approximately 11:35 a.m. on the morning of the incident. He located a tan rifle case containing a bolt-action .22-caliber rifle. He found the rifle case in a grassy area between the Brandt facility and a water treatment plant. The area was north of the Martin Sullivan facility. Reichard identified photographs of the rifle and rifle case, which were admitted into evidence. Reichard indicated the photographs accurately depicted the location where the rifle case was found and how the rifle and rifle case appeared on the day of the incident. The photographs showed the rifle case was located in an open, grassy field. Some buildings were visible in the background.

¶ 26 Jason Simmons, a McLean County deputy sheriff, testified that he responded to an area north of Lexington at approximately 9:45 a.m. on the day of the incident. Officers had received a report of a trespasser on a train. The trespasser was described as a white male wearing a backpack and carrying a long gun case. Deputy Simmons met with a railroad employee who told him the man was wearing a camouflage jacket and a backpack.

¶ 27 Deputy Simmons learned Hanner had confronted an individual, and he proceeded to Hanner's location. Deputy Simmons began looking for the subject. As more officers arrived, a perimeter was established. A suspect was eventually located and taken into custody. Officers searched the area and found a backpack at one location and a rifle and rifle case at another location. Deputy Simmons took photographs of the backpack and gave Reichard the camera he

had been using so Reichard could take pictures of the rifle case. The rifle case was approximately 50 to 75 yards away from the backpack.

¶ 28    The photographs of the backpack showed that it was recovered in an open, grassy area. Deputy Simmons testified that buildings comprising the Brandt facility appeared in the background of the photographs. The same buildings were also present in the photographs of the rifle case. Other photographs were taken later at the sheriff's office and depicted the contents of the backpack. The backpack contained rounds of .22-caliber ammunition. Deputy Simmons testified the rifle recovered from the field was a Marlin bolt-action .22-caliber rifle. There was a spent shell casing in the bolt face, which indicated a round had been fired but not ejected.

¶ 29    Deputy Simmons testified he did not see defendant wearing a camouflage shirt nor did he see him with a backpack or rifle case. He believed defendant was wearing a plaid shirt. To Deputy Simmons's knowledge, officers never recovered a camouflage jacket. He did not see defendant near the location where the backpack and rifle were found, and he did not observe defendant throwing away items at any point. Deputy Simmons testified it was not uncommon for people to shed layers of clothing when running from the police.

¶ 30    A second map of the area was introduced into evidence. Deputy Simmons marked on the map where the subject was first seen at the intersection of Route 66 and Orange Street. He then marked where the rifle case was found, which was in an open area to the southeast of the intersection where the subject was initially seen. He marked where the backpack was recovered, which was in an open area south of where the rifle case was found. Deputy Simmons marked the location where the Martin Sullivan employees saw a man walking, which was in an open area southeast of the location where the backpack was recovered. He also marked where defendant

was apprehended, which was in an open area to the southeast of the location where the Martin Sullivan employees observed a man walking.

¶ 31    The trial court found defendant not not guilty of all charges and remanded him to the custody of DHS for further treatment. Defendant filed a motion to reconsider, arguing that the evidence at the discharge hearing failed to prove him not not guilty beyond a reasonable doubt. On November 24, 2021, the trial court denied the motion.

¶ 32    On November 30, 2021, defendant filed a notice of appeal indicating he was appealing the judgment of the trial court entered on November 23, 2021. Defendant was later permitted to file an amended notice of appeal, which clarified that he was appealing the order entered on November 24, 2021. The amended notice of appeal stated that the nature of the order appealed from was the finding of not not guilty and the denial of the motion to reconsider.

¶ 33                              II. ANALYSIS

¶ 34                         A. Sufficiency of the Evidence

¶ 35    On appeal, defendant argues the State presented insufficient evidence at the discharge hearing to prove him not not guilty of the charged offenses. Specifically, defendant argues the evidence was insufficient to prove that he was the person Detective Hanner initially observed standing in the middle of the road. Defendant contends the evidence only established that he was found nearby some 80 to 90 minutes later.

¶ 36    If the court finds there is not a substantial probability that a defendant charged with a felony will attain fitness within one year, the defendant or the State may request a discharge hearing. 725 ILCS 5/104-17(e), 104-23 (West 2020). The purpose of a discharge hearing is to determine the sufficiency of the evidence, and the parties may introduce evidence relevant to the defendant's guilt of the charged crime. *Id.* § 104-25. "If the evidence does not

prove the defendant guilty beyond a reasonable doubt, the court shall enter a judgment of acquittal." *Id.* § 104-25(b). If the defendant is not acquitted following the discharge hearing, the defendant may be remanded for an extended period of treatment. *Id.* § 104-25(d).

¶ 37            "[A] discharge hearing under section 104-25 is an 'innocence only' hearing." *People v. Waid*, 221 Ill. 2d 464, 480 (2006). It is not a proceeding to determine guilt, as "[t]he question of guilt is to be deferred until the defendant is fit to stand trial." *People v. Rink*, 97 Ill. 2d 533, 543 (1983). "A discharge hearing simply enables an unfit defendant to have the charges dismissed if the State does not have the evidence to prove he committed the charged offenses beyond a reasonable doubt." *Waid*, 221 Ill. 2d at 480. "Although a court's determination at a discharge hearing that the State has proved the defendant's guilt beyond a reasonable doubt does not constitute a technical determination of guilt, the standard of proof is the same as that required for a criminal conviction." *People v. Williams*, 312 Ill. App. 3d 232, 234 (2000).

¶ 38            When presented with a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant''s guilt." *Id.*

¶ 39            "Circumstantial evidence is sufficient to sustain a criminal conviction, provided that such evidence satisfies proof beyond a reasonable doubt of the elements of the crime charged." *People v. Hall*, 194 Ill. 2d 305, 330 (2000). "The trier of fact need not *** be satisfied beyond a reasonable doubt as to each link in the chain of circumstances. It is sufficient if all of

the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt." *Id.* "A trier of fact is not required to disregard inferences which flow normally from the evidence before it, nor must the trier of fact search out all possible explanations consistent with innocence, and raise those explanations to a level of reasonable doubt." *In re Jonathon C.B.*, 2011 IL 107750, ¶ 60.

¶ 40    To prove a defendant guilty of unlawful possession of a weapon by a felon or unlawful possession of firearm ammunition by a felon, the State must establish the defendant (1) knowingly possessed any firearm or firearm ammunition and (2) has been convicted of a felony. 720 ILCS 5/24-1.1 (West 2020). To prove a defendant guilty of obstructing a peace officer, the State must prove that the defendant knowingly resisted or obstructed the performance of an authorized act by someone the defendant knew to be a peace officer. *Id.* § 31-1(a).

¶ 41    In the instant case, the evidence at the discharge hearing was sufficient to prove beyond a reasonable doubt that defendant committed the charged offenses. Defendant does not dispute that the State introduced evidence that defendant had previously been convicted of a felony. Defendant also admits the evidence was sufficient to establish that the person Hanner initially saw in the road possessed a firearm and ammunition and knowingly obstructed an act of a police officer. He contests only whether the evidence established that he was the person observed by Hanner.

¶ 42    We find, viewing the evidence in the light most favorable to the State, a rational trier of fact could find there was sufficient circumstantial evidence establishing defendant was the person Hanner initially observed standing in the road. Officers testified they had received reports of a white male in the area wearing a camouflage jacket and a backpack and carrying a long gun case. Hanner testified that while he was driving to investigate a potentially armed

- 12 -

trespasser on a railway line, a motorist informed Hanner he had observed a man with a rifle standing in the middle of the road. Hanner continued driving and subsequently observed a man standing in the middle of the road holding a long, narrow object. Hanner turned on his emergency lights and yelled at the man to get down. The man's reaction indicated he heard Hanner. The man then fled.

¶ 43            Deputy Simmons and Hanner testified that a perimeter was established around the area after the man ran from Hanner. Hanner explained that the purpose of the perimeter was to contain subjects inside it. Defendant was subsequently found within the perimeter in a grassy field to the south and east of the location where Hanner saw the man in the road. Defendant initially ran from the officers when he was located in the field, which may be viewed as evidence of consciousness of guilt. *People v. Peete*, 318 Ill. App. 3d 961, 966 (2001) (holding that a trier of fact may consider flight as circumstantial evidence of consciousness of guilt). A rifle, rifle case, and backpack containing ammunition were found between the location where Hanner initially saw the man in the road and the location where defendant was apprehended. Maps and photographs of the area where the incident occurred that were introduced into evidence showed the area was not densely populated. Rather, it was a semi-rural area containing a few businesses with open spaces in between them. The photographs of the backpack and the rifle showed the area where these items were found was an open grassy field with a few industrial buildings in the vicinity.

¶ 44            From this evidence, a rational trier of fact could reasonably infer that defendant fled from the area of his initial encounter with Hanner, dropping items he was wearing or carrying during his flight, and ended up in the area where he was later apprehended. Indeed, the locations of the recovered backpack and rifle case, as identified on the map in evidence, reflect a

fairly direct path between the area of Hanner's initial encounter with the man in the road and the area of defendant's capture. Thus, the evidence was sufficient to support the trial court's finding of not not guilty of the charged offenses.

¶ 45       We reject defendant's reliance on *People v. Reid*, 136 Ill. 2d 27, 61 (1990), and *People v. Tates*, 2016 IL App (1st) 140619, ¶ 29. Defendant cites *Reid* and *Tates* for the proposition that it was not enough for the State to "connect" defendant to the scene or show his brief flight from the officers prior to his arrest. The court in *Reid* held that "a defendant's presence at the scene of a crime, even when coupled with his or her flight from the scene, is not enough to prove accountability." *Reid*, 136 Ill. 2d at 61. The *Tates* court held the defendant's mere presence at the scene, even coupled with flight, was insufficient evidence to establish that he constructively possessed contraband. *Tates*, 2016 IL App (1st) 140619, ¶ 29. The instant case involves neither accountability nor constructive possession. Rather, this case involves circumstantial evidence of actual possession. Defendant admits the evidence was sufficient to show the man Hanner observed in the middle of the road possessed a firearm, firearm ammunition, and obstructed an authorized act of a police officer. As we have discussed, the circumstantial evidence in this case was sufficient for a rational trier of fact to find that this person was defendant. See *supra* ¶¶ 43-44.

¶ 46       We also reject defendant's reliance on *People v. Dowaliby*, 221 Ill. App. 3d 788 (1991), in support of his position that the State's evidence was insufficient because it failed to prove defendant was the only person with the opportunity to commit the crime. In *Dowaliby*, the appellate court held the defendant's conviction for the murder of his daughter could not be sustained based solely on evidence that he had the opportunity to commit the offense because he and his wife were the only adults in the house on the night the victim disappeared. *Id.* at 797. The

court found the defendant's wife acting alone, his mother, and a potential intruder also had the opportunity to commit the offense. *Id.* at 797-99. The *Dowaliby* court held that "[o]pportunity alone *** is not sufficient to sustain a conviction unless the State can prove beyond a reasonable doubt that no one else had the opportunity to commit the crime." *Id.* at 797. The State's remaining evidence in *Dowaliby* was similarly underwhelming. *Id.* at 800. The *Dowaliby* court concluded the State failed to introduce sufficient evidence to directly or indirectly link the defendant with the murder. *Id.* at 801.

¶ 47 Here, unlike in *Dowaliby*, there was sufficient evidence linking defendant with the offense. The evidence at the trial showed officers established a perimeter around the area where Hanner observed the man in the road in order to contain any subjects within the perimeter. The officers found defendant walking through a field inside that perimeter 80 to 90 minutes after Hanner encountered the man in the road. A rifle and backpack were found in between the location where the man in the road was seen and the location where defendant was later found.

¶ 48                                 B. Fitness Hearing

¶ 49 Defendant raises several issues concerning his fitness hearing. Defendant argues the trial court abused its discretion in finding him unfit to stand trial because it relied solely on Dr. Killian's report, which failed to adequately explain how defendant was unfit. Defendant also argues the trial court abused its discretion in finding him unfit because it failed to ensure his presence at the fitness hearing. Finally, defendant argues the trial court erred in denying him his right to a jury determination of his fitness.

¶ 50 Though not raised by the parties, we must examine whether we have jurisdiction to consider defendant's challenge to his fitness hearing in this appeal. See *People v. Smith*, 228

- 15 -

Ill. 2d 95, 104 (2008) ("A reviewing court has an independent duty to consider issues of jurisdiction, regardless of whether either party has raised them.").

¶ 51 Pursuant to Illinois Supreme Court Rule 606(b) (eff. July 1, 2017), "the notice of appeal must be filed with the clerk of the circuit court within 30 days after the entry of the final judgment appealed from or if a motion directed against the judgment is timely filed, within 30 days after the entry of the order disposing of the motion." The filing of the notice of appeal is jurisdictional. Ill. S. Ct. R. 606(a) (eff. July 1, 2017). Accordingly, "[o]ur subject-matter jurisdiction depends on the filing of a notice of appeal within the time prescribed by Rule 606(b)." *People v. Coleman*, 2017 IL App (4th) 160770, ¶ 15; see also *People v. Kellerman*, 342 Ill. App. 3d 1019, 1023 (2003) ("The timely filing of a notice of appeal is necessary for an appellate court to have jurisdiction over a criminal matter.").

¶ 52 An order finding a defendant unfit to stand trial is a final, appealable order. 725 ILCS 5/104-16(e) (West 2020) ("An order finding the defendant unfit is a final order for purposes of appeal by the State or the defendant."); Ill. S. Ct. R. 604(e) (eff. July 1, 2017) ("The defendant or the State may appeal to the Appellate Court from an order holding the defendant unfit to stand trial or be sentenced.").

¶ 53 In the instant case, defendant did not file a timely notice of appeal following the trial court's order finding him unfit to stand trial, which was entered on August 3, 2020. Defendant's notice of appeal filed on November 30, 2021, identified only the order finding him not not guilty following the discharge hearing as the order being appealed. The time for appealing the order finding defendant unfit had long passed at that point. At oral argument, defendant conceded his appeal of the court's unfitness finding was untimely. Accordingly, we

find that we lack jurisdiction to review the propriety of the trial court's finding of unfitness because defendant failed to properly perfect an appeal of that order pursuant to Rule 606.

¶ 54                                   III. CONCLUSION

¶ 55          For the reasons stated, we affirm the trial court's judgment.

¶ 56          Affirmed.