# Illinois Official Reports

## Appellate Court

---

### *People v. Mayo*, 2017 IL App (2d) 150390

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EDUARDO MAYO, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-15-0390 |
| Filed | May 16, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 13-CF-1656; the Hon. James C. Hallock, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | Michael J. Pelletier, Thomas A. Lilien, and Ann Marie Fick, of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Joseph H. McMahon, State's Attorney, of St. Charles (Patrick Delfino, Lawrence M. Bauer, and Steven A. Rodgers, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE HUTCHINSON delivered the judgment of the court, with opinion.<br>Presiding Justice Hudson and Justice Birkett concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant, Eduardo Mayo, appeals from the judgment of the circuit court of Kane County finding him "not not guilty" of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(d) (West 2012)) and battery (720 ILCS 5/12-3(a)(2) (West 2012)). Because the evidence was insufficient to support the trial court's finding as to either offense, we reverse.

¶ 2    Defendant was indicted on one count of aggravated criminal sexual abuse for knowingly committing an act of sexual conduct for the purpose of his or the victim's sexual gratification or arousal, where the victim was at least 13 but under 17 years old and he was at least 5 years older than the victim (720 ILCS 5/11-1.60(d) (West 2012)), and one count of battery for knowingly making physical contact of an insulting or provoking nature by grabbing the victim (720 ILCS 5/12-3(a)(2) (West 2012)). The trial court found defendant unfit to stand trial and scheduled a discharge hearing (725 ILCS 5/104-23 (West 2012)).

¶ 3    A discharge hearing is not a criminal proceeding. *People v. Olsson*, 2011 IL App (2d) 091351, ¶ 4 (citing *People v. Waid*, 221 Ill. 2d 464, 470 (2006)). A discharge hearing takes place only after a defendant has been found unfit to stand trial, and it is a proceeding to determine only whether to enter a judgment of acquittal, not to make a determination of guilt. *Id.* The question of guilt is deferred until the defendant is fit to stand trial. *Id.* If the evidence presented at a discharge hearing is sufficient to establish the defendant's guilt, no conviction results; instead, the defendant is found "not not guilty" (*id.*) and is subject to further treatment, ranging from one to five years depending on the offense. 725 ILCS 5/104-25(d) (West 2012). If, at the expiration of the treatment period, the defendant remains unfit, the court must determine whether the defendant is subject to involuntary commitment; if so, the commitment cannot exceed the maximum sentence to which the defendant would have been subject had he been convicted in a criminal prosecution. 725 ILCS 5/104-25(g)(2) (West 2012). Although a judicial finding of not not guilty does not result in a conviction, the standard of proof is the same as that required for a conviction. *People v. Orengo*, 2012 IL App (1st) 111071, ¶ 25.

¶ 4    The following evidence was established at defendant's discharge hearing. Defendant, who was 23 years old, suffered a brain injury when he was 5 months old. Defendant lived in Chicago with his mother, Leonor Gonzalez, her husband, and defendant's brother and sister.

¶ 5    On August 10, 2013, defendant went with Gonzalez and her friends to a Walmart in East Dundee. At approximately 9:15 p.m., while the group was eating inside near the store's front entrance, Gonzalez's friend's husband went to a nearby bathroom. When defendant followed, Gonzalez told her friend's husband to keep an eye on defendant. A video surveillance recording showed that, during a period of about 45 minutes, defendant entered and exited the bathroom six times.

¶ 6    The alleged victim was a 15-year-old male with Down Syndrome. On August 10, 2013, the victim, his father, and his 12-year-old sister went to the East Dundee Walmart.

¶ 7    At approximately 9:36 p.m., while his sister waited outside, the victim entered the bathroom. Defendant entered the bathroom a few seconds later. At approximately 9:37 p.m., defendant exited the bathroom, but the victim remained inside. At approximately 9:40 p.m., a Walmart employee entered the bathroom. A few seconds later, defendant reentered the bathroom. At about 9:41 p.m., the employee exited the bathroom. About 30 seconds later, the

victim exited, followed closely by defendant. The video showed the victim, as he walked away from the bathroom, looking over his shoulder at defendant.

¶ 8        According to the victim, as he was standing near the sink in the bathroom, defendant reached out with his hand and grabbed the victim's penis. The victim had his pants on when defendant grabbed him. The victim described the grab as hard.

¶ 9        The victim did not report the incident to anyone until August 12, 2013. On that morning, the victim told his sister and father that a man had grabbed him in the groin area while in the Walmart bathroom. The victim's father reported the incident to the East Dundee police.

¶ 10        On August 14, 2013, Pam Ely, an investigator with the Kane County children's advocacy center, and Detective Dan Duda of the East Dundee police department met with the victim. The victim told Ely that while he was in the Walmart bathroom a man touched him really hard. The victim pointed to his groin.

¶ 11        When Ely met with the victim a second time, she showed him a still photograph from the Walmart surveillance video, which showed the victim and defendant exiting the bathroom. The victim pointed to defendant and said that he was the one who grabbed him. In doing so, he pointed to his groin area.

¶ 12        Ely and Duda spoke to defendant with Gonzalez present. Ely identified herself, and Duda identified himself as a police officer. When Ely showed defendant an anatomical male drawing, he identified the penis as a "pee pee."

¶ 13        Gonzalez told Ely that she spoke English. Ely spoke to Gonzalez in English and described her responses as appropriate to the questions. According to Ely, when she told Gonzalez that she and Duda were there because defendant had possibly touched someone inappropriately in a bathroom, Gonzalez responded that the Chicago police had told her that defendant had a problem touching others in bathrooms. Ely later reviewed Chicago police reports, but there were none involving defendant. Gonzalez also said that, once when she was in a park with defendant, he had an erection. According to Ely, Gonzalez told her that, because defendant had ordered $800 worth of pornography via cable television, she had blocked his ability to do so.

¶ 14        Gonzalez denied telling Ely and Duda that defendant had a problem touching others at the park. When Gonzalez was asked if she had a problem with defendant ordering pornography at home, she admitted that he "did once." She explained that the cable bill was about $700 because someone had ordered "like wrestling and movies, all kind of, not just [pornography]." Gonzalez could not tell who ordered the various items. She then blocked the ability to order pornography.

¶ 15        Gonzalez remembered that a man and a woman came to her house to talk about defendant. When asked if she recalled telling them that defendant had a problem touching others inappropriately, Gonzalez did not recall doing so and explained that she was not worried about defendant touching others inappropriately because he never had, other than "like an arm, that's all." She also denied telling Ely and Duda that the Chicago police had told her about defendant touching others at a park. She admitted that the police brought defendant to her at a park because somebody had reported seeing defendant with an erection. According to Gonzalez, the police told her to take care of defendant and not let him go out by himself. When asked if defendant had been suspended from school for touching someone in the bathroom, Gonzalez admitted that he had been suspended once but only for fighting. According to Gonzalez, defendant is not violent, and she had never seen him touch anyone sexually. Although she

never discussed sex with defendant, she had told him not to touch anyone or let anyone touch him.

¶ 16    Gonzalez described defendant as being physically 24 years old but acting like a 5- or 6-year old. According to Gonzalez, defendant must be told what to do. For instance, if she did not tell him to change his clothes, he would not do so.

¶ 17    Dr. Mark Kuzia, a licensed clinical psychologist for the Kane County diagnostic center, conducted a fitness evaluation of defendant. Kuzia met with defendant. Defendant provided one- or two-word responses to Kuzia's questions. Because of defendant's limited ability to communicate, Kuzia relied primarily on a 2012 evaluation report by Dr. Dan Vogel. Kuzia did not believe that any further testing needed to be done, as Vogel's assessment was recent and defendant's condition was long-term and not likely to change. Kuzia recalled that Vogel's report mentioned that defendant had had an incident at school involving "inappropriate sexual contact in the bathroom."

¶ 18    Kuzia was concerned that defendant was a potential danger to society based on the charged incident, the prior sexual incident at school, and his intelligence quotient (IQ) of 48. Kuzia opined that defendant would need comprehensive care and consistent monitoring to ensure that his behavior does not violate others who are vulnerable.

¶ 19    According to Kuzia, defendant is moderately retarded and developmentally disabled. Defendant scored almost as low as he could score on the IQ tests. Defendant lacks executive functioning, which is the ability to decide what he needs to do next. He has difficulty with any question requiring a fluid thought process. According to Kuzia, defendant is not able to "move forward with much forethought or intent." Kuzia described defendant's ability to communicate as practically nonexistent. Defendant displayed a blank expression most of the time and looked confused. Kuzia described him as verbal but nonresponsive. Kuzia admitted that he learned from Vogel's report that defendant is optimistic, has a pleasant disposition, and is easily motivated to perform tasks with direction. Vogel's report was not admitted into evidence.

¶ 20    Kuzia's written report was admitted. In that report, Kuzia described defendant as being in the extremely low range of cognitive functioning. According to the report, defendant does not have any criminal history. Kuzia opined in the report that there is a legitimate concern that defendant lacks the insight to recognize whether any sexual acting out is inappropriate. That, combined with the reported sexual incident at the school, indicates that defendant needs to be monitored consistently. The report concluded that, because defendant lacks the cognitive capacity to understand the inappropriateness of his behavior, he requires comprehensive care and consistent monitoring to ensure that his behavior does not violate others.

¶ 21    Defendant called three witnesses. Rita Kelly, the administrator of Neighborhood Opportunities, operated a community integrated living arrangement (CILA) where defendant had resided for the previous year with three other males. After being charged, defendant was placed there by the Department of Human Services.

¶ 22    As part of defendant's individual service plan, a risk assessment was completed. That assessment indicated that defendant was not a risk to be violent. According to Rita, defendant has not shown any signs of violence while living at the CILA. Nor have there been any complaints about defendant being sexually aggressive. Rita described him as very passive. He requires 24/7 monitoring, however, because he will "stand there until somebody tells him what to do."

¶ 23 Erin Kelly, Rita's daughter, worked for Neighborhood Opportunities. She developed individual service plans for each resident at the various CILAs. In that capacity, she had known defendant for about a year. During that time, she had never seen defendant act aggressively or sexually.

¶ 24 According to Erin, an inventory of client and agency planning (ICAP) measures motor skills, social and communication skills, personal living skills, and community living skills. Defendant's ICAP showed his overall range to be that of someone three years, five months old. His highest score, for personal living skills, was that of someone six years, two months old. His score for motor skills was that of a three-year-old, for social and community skills that of a two-year, eight-month old, and for community living skills that of a three- to four-year-old. According to Erin, defendant was assessed for behavioral issues by a behavioral specialist, but he was not placed in a behavioral program. His only behavioral issue was that he cried when others around him were yelling. Erin had never seen or heard of any complaints about defendant attacking anyone. Nor had she seen him be overly concerned about anyone's body. She had not seen him engage in any behaviors that would indicate that he understands sexual acts. Defendant has attended community dances and has not been involved in any incidents. She admitted that one time he struck out at someone who was teasing him, but he did not make contact.

¶ 25 Megan Kelly, also Rita's daughter, worked as a direct service professional at Neighborhood Opportunities. Her duties included cooking, cleaning, assisting residents with daily activities, and helping them with their goals. Although she was assigned to a different CILA than defendant, she worked with him at a workshop Monday through Friday from about 9 a.m. to 3:30 p.m. She described defendant as very shy. She had received no complaints about his behavior. He had no problems with using the bathroom and did not touch others inappropriately. According to Megan, defendant knows how to care for and groom himself. She had no specific concerns about defendant and had never seen him in a fight. If others fight or yell, he will cry.

¶ 26 The trial court found that the victim's failure to report the incident until two days later, considering the victim's developmental disability, did not indicate that the incident did not occur. The court found that the victim's looking back at defendant upon exiting the bathroom was "very telling." The court found that the victim was credible. The court also found Ely and Kuzia credible. Although the court found the three defense witnesses "very credible, very believable," it commented that their testimony was "really after the fact" in that "[t]hey came into contact with the defendant after this particular event." The court found that the evidence was sufficient to show that defendant touched the victim for defendant's sexual gratification. Thus, the court ruled that defendant was "not not guilty" as to both counts.

¶ 27 Defendant filed a motion to reconsider. In denying that motion, the trial court noted that Kuzia could rely on hearsay—specifically, Vogel's report—to formulate his opinions. The court recalled that the evidence showed that defendant ordered "just over $800 worth of pornography and wrestling." The court found that, based on the surveillance video and the victim's testimony, it was "certain that [defendant] was acting out sexually." The court found that defendant's walking in and out of the bathroom several times showed that he was seeking a victim. The court added that the fact that the bathroom was a "secret place" further showed defendant's intent. Defendant filed a timely notice of appeal.

¶ 28    On appeal, defendant contends that the evidence was insufficient to prove beyond a reasonable doubt that he knowingly touched the victim for the purpose of defendant's sexual gratification or arousal or that he knowingly touched the victim in an insulting or provoking manner. The State responds that, when the evidence is viewed in the light most favorable to the prosecution, it was sufficient to prove that defendant was not not guilty of aggravated criminal sexual abuse and battery.

¶ 29    As noted, although a judicial finding of not not guilty does not result in a conviction, the standard of proof is the same as that required for a conviction. *Id.* Thus, the applicable standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Peterson*, 404 Ill. App. 3d 145, 150 (2010) (citing *People v. Collins*, 106 Ill. 2d 237, 261 (1985)).

¶ 30    The *mens rea* of a crime can rarely be proved with direct evidence. *People v. Sanchez*, 292 Ill. App. 3d 763, 771 (1997). Rather, the *mens rea* is generally inferred from circumstantial evidence. *People v. Holt*, 271 Ill. App. 3d 1016, 1025 (1995). That is equally so for a case of criminal sexual abuse. *People v. C.H.*, 237 Ill. App. 3d 462, 472 (1992). Whether a defendant acted with the required mental state is a question for the trier of fact. *People v. Wehrwein*, 209 Ill. App. 3d 71, 81 (1990). An appellate court should not substitute its judgment for that of the trier of fact, unless the judgment at trial was inherently implausible or unreasonable. *People v. Price*, 225 Ill. App. 3d 1032, 1035 (1992).

¶ 31    Here, defendant was charged with knowingly committing an act of sexual conduct. See 720 ILCS 5/11-1.60(d) (West 2012). Pertinent to this case, sexual conduct is defined as a knowing touching by the defendant of the victim's sex organ through the clothing of the victim for the purpose of the defendant's sexual gratification or arousal. See 720 ILCS 5/11-0.1 (West 2012). Sexual gratification or arousal, however, is not defined by statute. *In re Davontay A.*, 2013 IL App (2d) 120347, ¶ 17. The intent to sexually gratify or arouse has no restrictive meaning and can be proved by circumstantial evidence, including an inference from the defendant's conduct. *People v. Burton*, 399 Ill. App. 3d 809, 813 (2010). Although a defendant's intent generally can be inferred solely from the nature of the act (*id.*), such an inference is not reasonable when the accused is a child (*In re Davontay A.*, 2013 IL App (2d) 120347, ¶ 19). The issue of a child's intent to sexually gratify or arouse must be determined on a case-by-case basis, and the fact finder must consider all of the evidence, including the child's age and maturity, before deciding whether such intent can be inferred. *Id.* The element of knowledge likewise can be inferred from circumstantial evidence. *People v. Burt*, 142 Ill. App. 3d 833, 836 (1986).

¶ 32    In this case, it is undisputed that defendant touched the victim's penis through the victim's clothing. The disputed issues are whether he knowingly did so for the purpose of his sexual gratification or arousal and knowingly made contact of an insulting or provoking nature.

¶ 33    Because defendant has an IQ of 48 and functions at the approximate level of a three-year-old, he is effectively a young child, notwithstanding his chronological age. Therefore, the trial court could not base its finding that he knowingly acted for the purpose of sexual gratification or arousal solely on the nature of the contact. See *In re Davontay A.*, 2013 IL App (2d) 120347, ¶ 19. Thus, the State offered additional evidence in attempting to show that defendant knowingly touched the victim for a sexual purpose. We will discuss that evidence in turn.

¶ 34    First, we consider Kuzia's report and testimony. Kuzia opined that defendant was a potential danger based on his low IQ, the charged incident, and a prior incident at school. That opinion is problematic in two respects. First, as discussed, because of defendant's limited mental capacity, the evidence of either incident alone could not establish that it was knowingly done for a sexual purpose. Second, although Kuzia, as an expert, could rely on Vogel's report, including the hearsay therein (see Ill. R. Evid. 703 (eff. Jan. 1, 2011); *People v. Lovejoy*, 235 Ill. 2d 97, 142-43 (2009)), which referred to the incident at school, Kuzia's recitation of Vogel's report did not include any details concerning that incident. More importantly, there was no indication that in the school incident defendant *knowingly* touched anyone for the purpose of either his or the alleged victim's sexual gratification or arousal. Other than the unsubstantiated reference to the prior incident, Kuzia referred to no evidence *aliunde* the charges and defendant's diminished mental capacity to support his opinion that defendant is sexually dangerous and in need of comprehensive care and consistent monitoring. Thus, to the extent that Kuzia's report and testimony were based on the charged incident and the prior incident, it did not support the not not guilty finding.

¶ 35    Because the evidence of the nondescript school incident was insufficient to support Kuzia's opinion, it was also insufficient to support the trial court's finding that defendant knowingly acted for the purpose of sexual gratification or arousal. As discussed, the vague reference to an incident involving inappropriate sexual conduct at school, without more, was not sufficient to show that defendant knowingly acted for the purpose of sexual gratification or arousal in this case.

¶ 36    As for the evidence that defendant had an erection in a park, the State offered no specifics as to that incident, such as whether defendant exposed himself, fondled himself, or otherwise sought sexual gratification. Like the school incident, the lack of specificity rendered that evidence insufficient to show that defendant knowingly touched the victim for the purpose of his sexual gratification or arousal.

¶ 37    The next piece of evidence involved defendant having ordered "pornography" via the television. We note first that the evidence was equivocal as to whether defendant actually ordered the pornography, as opposed to someone else in the home having done so. However, even if defendant did, there was no evidence that he ever watched the pornography, that he understood what he was ordering, or that he was sexually gratified or aroused by it.

¶ 38    That brings us to the last piece of the State's evidence, the surveillance video. In relying on that, the trial court commented that, when the victim looked back at defendant, the victim showed concern and fear. However, any such concern or fear does not prove that defendant knowingly acted for a sexual purpose.

¶ 39    Defendant also entered and exited the bathroom six times in a 45-minute period. The trial court found that that showed defendant's effort to seek out a victim. Kuzia's testimony, however, was that defendant was *incapable* of acting with much forethought or intent and that he could not decide what to do next. Additionally, Gonzalez testified that defendant had to be told what to do, and Rita Kelly testified that defendant would stand in one place until told what to do. Based on Kuzia's opinion and the testimony of Gonzalez and Rita Kelly, it was not reasonable to infer from the number of times that defendant entered and exited the bathroom that he was seeking out a victim.

¶ 40    Next, the trial court concluded that the fact that the bathroom was a "secret place" showed defendant's intent. We respectfully disagree. Although a bathroom is generally a place where

private bodily functions are performed, the bathroom in this case was public. Indeed, the video showed numerous people, other than defendant and the victim, going in and out of the bathroom, including a Walmart employee only moments before the incident. Additionally, the act occurred near the sink, as opposed to inside a stall. Therefore, the act did not occur in a secret place such that it was reasonable to infer any intent by defendant to commit a crime.

¶ 41    We note that the trial court relied, in part, on *Burton*. However, that reliance was misplaced as *Burton* is clearly distinguishable. The defendant in *Burton* was an adult with no developmental disabilities. Therefore, this court noted that whether the defendant acted with the intent to gratify or arouse himself sexually could be inferred solely from the nature of the act. *Burton*, 399 Ill. App. 3d at 812-13. Additionally, the defendant in *Burton* pinned the victim on a bed, placed his hand inside of her bra, and touched her breast. According to the victim, the incident lasted almost 30 seconds. *Id.* at 811. Here, on the other hand, defendant was developmentally disabled and the incident involved a single touching of the victim's groin. Thus, *Burton* does not support the court's finding.

¶ 42    Finally, we note that the trial court gave little, if any, weight to the testimony of Rita, Erin, and Megan Kelly because it was based on their observations "after the fact." But on the issue of defendant's intent based on his limited mental capacity, their testimony was highly relevant. Defendant's mental capacity was not fluid. Indeed, Kuzia opined that defendant's condition was long-term and not likely to change. Thus, the court improperly discounted the post-incident evidence, which showed that defendant was neither sexually aggressive nor dangerous.

¶ 43    We conclude that the State's evidence was insufficient to prove beyond a reasonable doubt that defendant, who had an IQ of 48 and the mental capacity of a three-year-old, knowingly acted for the purpose of his sexual gratification or arousal. That leaves the issue of whether defendant was properly found not not guilty of battery. As relevant here, a person commits battery if he knowingly without legal justification makes physical contact of an insulting or provoking nature. 720 ILCS 5/12-3(a)(2) (West 2012). A person acts knowingly if he is consciously aware that a particular result is practically certain to be caused by his conduct. 720 ILCS 5/4-5(b) (West 2012). Again, because defendant had an IQ of 48 and the mental capacity of a three-year-old, the nature of the act alone did not prove that he knowingly made contact of an insulting or provoking nature. Moreover, there was no other evidence that he did.

¶ 44    Although the standard for reversing a finding of not not guilty is high, we believe that, in light of the overwhelming evidence of defendant's extremely low mental capacity, the evidence was not sufficient, even when viewed in the light most favorable to the State, to prove beyond a reasonable doubt that defendant knowingly touched the victim for his sexual gratification or arousal or that he knowingly made contact of an insulting or provoking nature. In our view, in the face of such evidence, no rational trier of fact could find defendant not not guilty of either criminal sexual abuse or battery.

¶ 45    For the reasons stated, we reverse the judgment of the circuit court of Kane County.

¶ 46    Reversed.