2026 IL App (2d) 250201-U
No. 2-25-0201
Order filed March 30, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,

v. ETTORE LACCHEI, Defendant-Appellant.

Appeal from the Circuit Court of Lake County.

Honorable Paul B. Novak, Judge, Presiding.

No. 23-CF-808

JUSTICE McLAREN delivered the judgment of the court.
Presiding Justice Kennedy and Justice Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) Sufficient evidence, albeit circumstantial, existed to support defendant's conviction of first degree murder of his next-door neighbor: *e.g.*, the two had argued outside the victim's home shortly before he was found shot in the head in his driveway, forensic testing matched the fired bullet (recovered from the victim's head) to a handgun found hidden in a vacant lot behind defendant's home, and DNA recovered from the gun matched defendant's DNA. (2) We decline to consider defendant's argument that his attorney at the discharge hearing was ineffective, as defendant asks for the wrong relief: an outright reversal of the trial court's not not guilty finding, not a new discharge hearing.

¶ 2    Defendant, Ettore Lacchei, was charged with three counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2020)). Defendant was found unfit to stand trial and, following a discharge hearing (725 ILCS 5/104-25 (West 2022)), was found "not not guilty" of each count. On appeal, defendant contends that (1) the evidence was insufficient to find him not not guilty beyond a

reasonable doubt of first degree murder and (2) he was denied the effective assistance of counsel when his trial attorney stipulated to certain firearm identification evidence. He asks that we reverse the trial court's finding of not not guilty of murder and enter a judgment of acquittal. We affirm.

¶ 3                                I. BACKGROUND

¶ 4    On April 12, 2023, William Martys was found unresponsive in his driveway. Emergency personnel transported Martys to the hospital, where he was later pronounced dead. An autopsy revealed that his cause of death was a gunshot wound to the head. On April 25, 2023, defendant—Martys's next-door neighbor—was arrested and charged by complaint with two counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2020)). The complaints were superseded by an indictment filed on May 17, 2023, charging defendant with three counts of first degree murder (*id.*).

¶ 5    On June 20, 2023, the trial court found that there was a *bona fide* doubt as to defendant's fitness to stand trial and ordered a fitness evaluation. On August 15, 2023, following a hearing, the court found defendant unfit to stand trial with "a guarded probability *** defendant [could] attain fitness within one year." The court remanded defendant to the custody of the Department of Human Services to undergo treatment for the purpose of being rendered fit to stand trial. On September 4, 2024, the court found that defendant remained unfit. Accordingly, the court continued the matter for a discharge hearing under section 104-25 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/104-25 (West 2022)).

¶ 6    The following relevant evidence was presented at the discharge hearing. Defendant and Martys lived on North Black Oak Avenue in Antioch. Martys lived next door to (and south of) defendant. Jeffery Zinck lived directly across the street from defendant.

¶ 7     On April 12, 2023, at around 7 p.m., David Phillips, Zinck's coworker, arrived at Zinck's house for a visit. Phillips noticed Martys across the street cleaning his driveway with a leaf blower. Phillips texted Zinck, who was shopping at Menards, to let him know that he had arrived at Zinck's home. Zinck had completed his purchases just before 7 p.m. and received Phillips's text at 7:05 p.m. Zinck left Menards and drove directly to his house, which was a "[c]ouple miles"—about "[f]ive minutes"—away. When Zinck arrived home, he parked his truck in his driveway. Phillips help Zinck unload some items from Zinck's truck and then they went inside Zinck's house to socialize and drink beer.

¶ 8     Prior to going inside, Phillips and Zinck witnessed an interaction between defendant and Martys across the street. According to Phillips, defendant exited his house, walked across his yard, and approached Martys as he was using the leaf blower. Phillips described defendant's and Martys's interaction as "spirited." Phillips testified: "There was definitely some anger and some hand raising. I couldn't exactly understand what they were exchanging, but it was definitely an altercation over dust and noise and whatever [Martys] was doing at the time." According to Phillips: "The main point was the dust and noise, heard a lot about it because [defendant] was pointing out all the dust. And I think there was mentioned about his wife's room being right at the edge of his home." Phillips did not see Martys respond "audibly" but "kind of saw him brush [defendant] off and try and just, you know, kind of just whatever, old man. And at that point he kind of walked back up his drive as if they were done arguing." Phillips did not know if Martys continued to use the leaf blower but thought that it "was his intention" to do more yardwork.

¶ 9     According to Zinck, defendant and Martys were "[t]alking, maybe arguing." Zinck testified: "[Martys] had been cleaning off his driveway so there was a large amount of dust blowing over [defendant's] house, and it looked like they were arguing about that." He stated: "It was a

little loud. I couldn't hear what they were saying, but it was loud ***." Both Martys and defendant were making hand gestures. During this time, Phillips and Zinck did not see anyone else in the area aside from defendant and Martys.

¶ 10 After witnessing the interaction, Phillips and Zinck went inside Zinck's house for "a while." Zinck testified: "We went in the house, and then we left the house, we went into my shop, my garage. And then we came out of the garage, we had a beer and [were] sitting on the tailgate just talking. And that's—all of a sudden an ambulance pulled up. ***." Phillips testified that when they had gone outside to go to the garage (where Zinck had his shop), "no one was out there anymore, both parties had left." Phillips and Zinck then spent some time in Zinck's garage. When they left the garage and went outside, "there was a new truck with a landscaping trailer attached that had pulled up. And those people were *** in the process at the time of calling the police because not long after that, an ambulance had pulled up."

¶ 11 Andrew Vroman, a firefighter and paramedic with the Antioch Fire Department, received a call at about 7:36 p.m. for a "person not breathing" at Martys's address. Vroman testified that when he arrived on the scene, two bystanders were performing CPR on Martys, who was lying next to his truck. Vroman's team took over CPR and transported Martys to the hospital; they were never able to get a pulse. Vroman noticed what he believed to be a "small abrasion" above Martys's left eye, but he did not know what caused it. Vroman did not see anything "concerning" near the scene, only "some slight bleeding from the abrasion."

¶ 12 Timothy Pederson, a Lake County sheriff's deputy, received a dispatch call just after 7:30 p.m. for an "assist rescue" at Martys's address. When Pederson arrived, emergency personnel were already present, along with "employees of the victim." Pederson processed and took

photographs of the scene after Martys was transported to the hospital. There was blood on the ground where Martys's head had been and a leaf blower to the left of Martys's body.

¶ 13    Village of Vernon Hills Police Sergeant Jennifer Weber testified that, on April 13, 2023, while with the Lake County Major Crime Task Force (Task Force), she oversaw a search of Martys's house. Nothing in the interior of the home looked suspicious, and there were no signs of a struggle. The search team did not recover any small-caliber firearms or other firearms-related evidence inside or outside the home. Aside from the blood on the driveway, there did not appear to have been a struggle outside.

¶ 14    Village of Lake Villa Patrol Sergeant Thomas Dvorak testified that, on April 14, 2023, while working with the Task Force, he was assigned to collect evidence during a search at defendant's home. The team was looking for "[f]irearms or firearm-related materials." During the search, the team found two handguns in the master bedroom, where a "majority of the belongings were." The first handgun was found in "a soft, black leather case" in a nightstand drawer along with "[a] partial case of .380 auto ammunition." The second handgun was found in "a soft, black leather gun case" in a dresser drawer along with "[a] magazine with ammunition." The team found "[a] similar black leather gun case" in a closet in the master bedroom, but the case was empty. (The empty gun case was admitted into evidence as People's exhibit No. 10.) Neither of the guns found in the house would fit in the empty gun case, and the team did not find any other firearm in the house that would. The guns that were found—a .380 caliber handgun and a 9-millimeter handgun—were larger than the empty case.

¶ 15    Lake County sheriff's detective John Hird testified that, on April 25, 2023, he participated in a search of defendant's home. Hird began in the basement and then proceeded outside. While Hird was outside, another officer "located a box of ammunition in a tree on the north side of the

property in the back, back of the property." The box was "weathered" and "there were bullets in there," but Hird could not recall how many ammunition rounds the box contained. After the box of ammunition was found, Hird went to "a vacant lot to the north of the property" and "began to follow a trail that wound through the forest, or wooded area." As he was walking the path, Hird "came upon a clear area." He stated: "On the ground, there was a *** it looked like there was a small burn patch, and there were several pieces of vinyl. It look[ed] like vinyl tile that were [*sic*] burned on this pile of patch." Hird "lift[ed] up the piece of the vinyl tile, and *** observed a firearm." Hird described the firearm as "a small-caliber firearm" with "a white handle and a dark barrel." Hird could not tell how long the firearm had been in that location before he found it.

¶ 16   Lake County sheriff's detective Timothy Fish testified that, on April 25, 2023, he assisted with evidence collection during the search of defendant's home. During the search, a spent .25-caliber cartridge casing was found in the grass area between Martys's and defendant's houses. Fish photographed and collected the casing, which was "Remington brand." (The cartridge casing was admitted into evidence as People's exhibit No. 2A.) Fish also photographed and collected "[t]wo boxes of .25-caliber ammunition" that had been found in the "crotch of a tree to the west of the residence." The boxes were under "leaves and debris." Fish could not recall "the count per box." He stated that "there was [*sic*]43 in one of them out of a 50-round box" and "[p]ossibly" around the same number in the other box. One box of ammunition was "Remington ammunition," and one was "Winchester brand ammunition." Asked if "the box of ammunition *** was in fairly weathered condition," Fish stated that the box "was fairly intact for being outdoors."[1]

---

[1]It is not clear which of the two boxes Fish mentioned earlier was discussed here.

¶ 17 Fish also photographed and collected the "semiautomatic .25-caliber handgun" that had been recovered by Hird "amongst some debris." (The firearm was admitted into evidence as People's exhibit No. 1A.) Fish described the location where the firearm was found as "a wooded lot with a partial clearing," which "borders the target residence to the north." He stated that it "looked like there was maybe a burn site there." Fish removed "the magazine" and "the live cartridge that was chambered," and he photographed the magazine and the live rounds. Fish testified that the ammunition removed from the firearm was .25-caliber Remington brand. Fish swabbed the handle, trigger guard, and slide area of the gun for DNA. Fish did not know how long any of the recovered items had been there before they were located.

¶ 18 The parties entered several stipulations regarding the forensic evidence. The parties stipulated to, among other things, Martys's autopsy results. The autopsy revealed that Martys's death was caused by a "gunshot wound to the head." During the autopsy, "[a] deformed, small caliber copper colored projectile" was removed from Martys's head. (The projectile was admitted into evidence as People's exhibit No. 3A.)

¶ 19 In addition, the parties stipulated that the following items were sent to the Northeastern Illinois Regional Crime Laboratory (crime lab): (1) "People's exhibit 1A, a Rigarmi Brescia, model pocket pistol, 6.35 (.25 Auto) caliber semiautomatic pistol"; (2) "People's exhibit 2A, a fired .25 Auto caliber cartridge case"; and (3) "People's exhibit 3A, a projectile removed from *** [Martys's head]," which "was identified as a .25 caliber fired bullet that exhibited 6 land and groove impressions inclined to the right."

¶ 20 The parties also stipulated that if called to testify, Anthony Spadafora, a forensic scientist employed at the crime lab since 2005, would be qualified as "an expert in the field of firearm and

toolmark identification and examination." Spadafora would testify that he completed the following comparisons and reached the following conclusions:

(1) "People's exhibit 1A, the *** [firearm] was inoperable as received. The firing pin assembly was not seated in the proper position and the firearm sear was stuck. The firing pin assembly was re-seated, and the sear was freed so the transfer bar could release the sear. The firearm (People's exhibit 1A) was then test fired and found to be in operating condition. The test fired cartridge casings and test fired projectiles are labelled as People's exhibit 4A."

(2) "People's exhibit 2A, [the] fired *** cartridge case was compared to People's exhibit 4A, the test fired cartridge case from People's exhibit 1A ***. Based upon the reproducibility of class and individual characteristics, the following identification was made:

    a. People's exhibit 2A, [the] fired *** cartridge case was microscopically identified as having been fired from People's exhibit lA, the *** [firearm]."

(3) "People's exhibit 3A, *** [the] fired bullet [removed from Martys] was compared to People's exhibit 4A, the test fired bullet from Peoples exhibit 1A, the *** [firearm]. Based upon the reproducibility of class and individual characteristics, the following identification was made:

    a. People's exhibit 3A, [the] fired *** bullet [removed from Martys] was microscopically identified as having been fired from People's exhibit 1A, the *** [firearm]."

¶ 21    In addition, the parties stipulated that a DNA swab collected from defendant and the DNA swab taken from the firearm were sent to the crime lab. Testing revealed that the DNA profile developed from defendant's swab matched the DNA profile developed from the firearm.

¶ 22    At the close of the State's evidence, defendant rested without presenting evidence. Defendant moved for a directed finding, which the trial court denied.

¶ 23    The trial found defendant "not not guilty" on all counts and ordered him to undergo an extended term of treatment until August 15, 2029.

¶ 24    Following the denial of his posttrial motions, defendant timely appealed.

¶ 25                                   II. ANALYSIS

¶ 26                           A. Sufficiency of the Evidence

¶ 27    Defendant first contends that the State failed to prove him guilty beyond a reasonable doubt of first degree murder. According to defendant, the State's evidence was entirely circumstantial and failed to account for the possibility that someone other than defendant committed the murder.

¶ 28    A discharge hearing under section 104-25 of the Code (725 ILCS 5/104-25 (West 2022)) is not a criminal prosecution. *People v. Waid*, 221 Ill. 2d 464, 470 (2006); *People v. Mayo*, 2017 IL App (2d) 150390, ¶ 3. "A discharge hearing takes place only after a defendant has been found unfit to stand trial, and it is a proceeding to determine only whether to enter a judgment of acquittal, not to make a determination of guilt." *Mayo*, 2017 IL App (2d) 150390, ¶ 3. Under section 104-25(b), "[i]f the evidence does not prove the defendant guilty beyond a reasonable doubt, the court shall enter a judgment of acquittal[.]" 725 ILCS 5/104-25(b) (West 2022). However, if the evidence of guilt is sufficient, the defendant is found "*not* not guilty." (Emphasis in original.) *Waid*, 221 Ill. 2d at 470; *Mayo*, 2017 IL App (2d) 150390, ¶ 3. In that instance, the defendant is not convicted but is remanded for further treatment, with the treatment period extended up to five

years depending on the offense. 725 ILCS 5/104-25(d)(2) (West 2022); *Mayo*, 2017 IL App (2d) 150390, ¶ 3. "The question of guilt is deferred until the defendant is fit to stand trial." *Mayo*, 2017 IL App (2d) 150390, ¶ 3. If the defendant remains unfit at the expiration of the treatment period, the court must decide whether he is subject to involuntary commitment. 725 ILCS 5/104-25(g)(2) (West 2022); *Mayo*, 2017 IL App (2d) 150390, ¶ 3. If so, the commitment cannot "exceed the maximum sentence to which a defendant would have been subject had he or she been convicted in a criminal proceeding." 725 ILCS 5/104-25(g)(4) (West 2022); *Mayo*, 2017 IL App (2d) 150390, ¶ 3.

¶ 29     Although a trial court's finding of not not guilty following a discharge hearing does not result in a conviction, the standard of proof is the same as that required for a conviction. *Mayo*, 2017 IL App (2d) 150390, ¶ 3. The State must prove beyond a reasonable doubt that the defendant committed the offense alleged. *People v. Orengo*, 2012 IL App (1st) 111071, ¶ 31. Thus, on appeal, we consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of face could have found the essential elements of the crime beyond a reasonable doubt." *Mayo*, 2017 IL App (2d) 150390, ¶ 29; see *People v. Collins*, 106 Ill. 2d 237, 261 (1985).

¶ 30     " 'Circumstantial evidence is sufficient to sustain a criminal conviction, provided that such evidence satisfies proof beyond a reasonable doubt of the elements of the crime charged.' " *People v. Galarza*, 2023 IL 127678, ¶ 27 (quoting *People v. Hall*, 194 Ill. 2d 305, 330 (2000)). " 'The trier of fact need not, however, be satisfied beyond a reasonable doubt as to each link in the chain of circumstances. It is sufficient if all of the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt.' " *Id.* (quoting *Hall*, 194 Ill. 2d at 330).

¶ 31 Further, "[t]he trier of fact determines the credibility of the witnesses, decides what weight to give their testimony, resolves conflicts in the evidence, and draws reasonable inferences from that evidence." *People v. Swenson*, 2020 IL 124688, ¶ 36. "A trier of fact is not required to disregard inferences that flow normally from the evidence before it, nor must the trier of fact search out all possible explanations consistent with innocence and raise those explanations to a level of reasonable doubt." *People v. Eubanks*, 2019 IL 123525, ¶ 95. "[A] reviewing court must allow all reasonable inferences from the record in favor of the prosecution." *Id.* On review, this court does not "retry the defendant" or "substitute our judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of witnesses." *People v. Conway*, 2023 IL 127670, ¶ 16. "A criminal conviction will not be overturned unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Id.*

¶ 32 To prove defendant guilty of first degree murder as charged here, the State was required to prove beyond a reasonable doubt that defendant, without legal justification, shot Martys (1) with intent to kill or do great bodily harm to him or (2) knowing that his act created a strong probability of death or great bodily harm. See 720 ILCS 5/9-1(a)(1), (2) (West 2020). Here, defendant challenges only his identity as the shooter.

¶ 33 Defendant argues that the evidence was insufficient because the case rested entirely on circumstantial evidence, specifically: (1) "a brief verbal altercation between [defendant] and Martys shortly before the murder" and (2) "[defendant's] DNA on a firearm later recovered in a vacant lot." He asserts that (1) no one witnessed the shooting, (2) no one saw defendant with a weapon, (3) no reasonable motive was established, (4) defendant never confessed, and (5) other

individuals had access to the firearm. According to defendant, the State failed to eliminate the possibility that another person, including defendant's wife, committed the offense.

¶ 34    We find that the totality of the circumstantial evidence and the reasonable inferences drawn therefrom, viewed in the light most favorable to the State, established beyond a reasonable doubt that defendant shot and killed Martys. Testimony from Phillips and Zinck established that, less than 30 minutes before Martys was found lying unresponsive on his driveway with a gunshot wound to his head, Martys was using a leaf blower to clean his driveway—an activity that apparently disturbed defendant. From across the street, Phillips saw defendant exit his house and approach Martys. Phillips stated that defendant "was pointing out all the dust. And *** mentioned about his wife's room being right at that edge of his home." Phillips described the men's "altercation" as "spirited," with "some anger and some hand raising." Zinck too surmised that the argument was over the "large amount of dust blowing over [defendant's] house." Zinck described the men's interaction as "loud." From the time of this interaction until Martys was discovered unresponsive, neither Phillips nor Zinck saw anyone else in the area (but the two were inside Zinck's house for part of that time).

¶ 35    The autopsy determined that a .25-caliber fired bullet recovered from Martys's head was the cause of his death. During a search of defendant's home and property, (1) a spent .25-caliber Remington brand cartridge casing was found in the grass between defendant's and Martys's homes; (2) two boxes of .25-caliber ammunition—one a Remington brand (with bullets missing)—were found hidden in a tree to the west of defendant's house, and (3) a semiautomatic .25-caliber firearm—containing Remington brand bullets—was found hidden in a vacant lot to the north of defendant's residence. A search of defendant's bedroom uncovered two firearms in leather cases (a .380 caliber handgun and a 9-millimeter handgun) and an empty leather case. Neither of the

two firearms fit in the empty case. The parties stipulated that a cartridge was test-fired from the firearm recovered in the vacant lot and that the fired bullet and casing matched the bullet recovered from Martys's body and the cartridge casing found in the grass. The parties stipulated further that defendant's DNA matched DNA found on the gun. To be sure, the evidence is circumstantial, but it is undoubtedly overwhelming. Based on this evidence, viewed in the light most favorable to the prosecution, a rational trier of face could have found the essential elements of the crime beyond a reasonable doubt.

¶ 36    Defendant attempts to cast doubt on the evidence by speculating that his wife, or some other person, may have committed the offense. However, "[w]here circumstantial evidence relied upon to support the defense that someone other than the defendant committed the crime is unsatisfactory, based upon mere surmise or possibility, a hypothesis of innocence may be rejected by the trier of fact." *Hall*, 194 Ill. 2d at 332. This is such a case. Defendant claims that Phillips's testimony implied that defendant's wife was home at the time of the offense given that defendant "mentioned about his wife's room being right at that edge of his home" where Martys was working. Defendant claims that the testimony implied not only that his wife was home, but that she "may have been more disturbed by the dust or noise." This is nothing more than speculation. Moreover, "[a] trier of fact is not required to disregard the inferences that normally flow from the evidence or to seek out all possible explanations consistent with a defendant's innocence and elevate them to reasonable doubt." *People v. Murphy*, 2017 IL App (1st) 142092, ¶ 11.

¶ 37    Defendant also argues that his ownership of the gun does not exclude the possibility that someone else committed the murder. He compares the facts of this case to *People v. Davis*, 278 Ill. App. 3d 532 (1996). In *Davis*, the victim was fatally shot in her bedroom in the early hours of the morning. *Id.* at 534. The murder weapon was owned by the defendant, but he claimed to have

lost it four years before the murder occurred, and "[t]he police did not find a single piece of evidence that placed [the defendant] in, at or near the Kenilworth home [where the murder occurred] on the day, evening or night of the homicide." *Id.* at 538. Under these facts, the defendant's mere ownership of the gun was insufficient evidence to convict him of murder. *Id.* at 540-41.

¶ 38    *Davis* is clearly inapposite, since here it is undisputed that defendant was present, arguing with Martys, shortly before Martys was found unresponsive. The murder weapon, with defendant's DNA on it, was found hidden near his home, and there was no evidence suggesting that it had been lost or stolen. Indeed, there was no evidence that anyone's DNA other than defendant's was present on the gun.

¶ 39    Defendant also directs us to *People v. Dowaliby*, 221 Ill. App. 3d 788 (1991), for the proposition that "[o]pportunity alone *** is not sufficient to sustain a conviction unless the State can prove beyond a reasonable doubt that no one else had the opportunity to commit the crime." *Id.* at 797. In *Dowaliby*, the defendant was convicted of the murder of his daughter. *Id.* at 789-90. Her body was found in a thicket about three miles from the family home (*id.* at 793), where she had resided with the defendant (her adopted father), her mother (the defendant's wife), her brother, and the defendant's mother (*id.* at 790). The State's case was based on the theory that the defendant and his wife were the only ones who had the opportunity to commit the murder. *Id.* at 797. The State presented evidence to support its position that an intruder could not have committed the murder (there were no signs of forced entry) and that it was not possible that the victim wandered out of the house late at night because there was no dirt or mud on her feet and the doors of the house were locked. *Id.* The State also relied on the strange and contradictory statements the defendant made after the victim went missing, which the State maintained were admissions of

guilt. *Id.* at 799. In addition, the State presented a witness who testified to observing a dark-colored car near the location where the victim's body was later discovered. *Id.* at 800. While the car's headlights were on, the witness saw a person in the driver's seat whose face in profile appeared to have a large nose. *Id.* When shown a photo lineup, the witness stated that the defendant's nose structure looked similar to the profile nose structure of the person he saw. *Id.*

¶ 40 The reviewing court reversed the defendant's conviction. *Id.* at 801. The court found that the State failed to produce "sufficient evidence to directly or indirectly link" the defendant to his daughter's murder. *Id.* The court noted that the "identification testimony was doubtful, vague, and unreliable" (*id.*) and that the defendant's statements could not reasonably "be construed as admissions of guilt" (*id.* at 800). The court also found that the State failed to prove that the defendant "was the only person who had the opportunity to murder [the victim]." *Id.* at 801. For instance, "[e]ither [the defendant's wife or his mother] could have murdered [the victim] without [his] knowledge, or an intruder could have entered the house on the evening of [the victim's] disappearance and murdered [her]." *Id.* As to the intruder possibility, the court noted that the police did not check all windows for signs of forced entry. *Id.* at 798-99.

¶ 41 Here, unlike in *Dowaliby*, the trial court did not rely on opportunity alone. There was significant circumstantial evidence before the court, as detailed above. Opportunity was merely one of the pieces of circumstantial evidence considered.

¶ 42 B. Ineffective Assistance of Counsel

¶ 43 Defendant next contends that trial counsel was ineffective for stipulating to Spadafora's expert testimony that the .25-caliber cartridge casing found at the scene and the .25-caliber bullet recovered from Martys were fired from the .25-caliber firearm (containing defendant's DNA) that was found hidden near defendant's house. Defendant argues that "effective representation required

- 15 -

at a minimum, a request for a *Frye* [*v. United States*, 293 F. 1013 (D.C. Cir. 1923)] hearing on the admissibility of Spadafora's testimony and opinion, and, failing that, rigorous cross-examination to expose the weaknesses and limitations of the firearm analyst's technique." Defendant asks that we "find that defense counsel's deficient performance prejudiced [defendant], and reverse the decision of the trial court finding [defendant] not not guilty."

¶ 44    Illinois courts evaluate claims of ineffective assistance of counsel under the two-prong test established in *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). See *People v. Albanese*, 104 Ill. 2d 504, 526 (1984) (adopting the *Strickland* standard). Under the *Strickland* standard, to prevail on a claim of ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness and (2) a reasonable probability exists that, but for counsel's errors, the result of the proceeding would have been different. *People v. Torres*, 2024 IL 129289, ¶ 27. "[I]f a defendant is deprived of effective assistance of counsel, the proper remedy is to reverse the defendant's conviction *and remand for a new trial*." (Emphasis added.) *People v. Lofton*, 2015 IL App (2d) 130135, ¶ 37; see also *People v. Young*, 306 Ill. App. 3d 350, 356 (1999) (same).

¶ 45    Defendant contends that he was deprived of the effective assistance of counsel, and he asks this court to reverse outright the trial court's not not guilty finding. Defendant does not ask for a new discharge hearing; he asks only for "a judgment of acquittal." Defendant does not cite any authority that would support his request for an acquittal were we to agree with his ineffectiveness claim. As noted, acquittal is not the proper remedy. Because defendant is not entitled to an acquittal and because he does not ask for a new discharge hearing, he has forfeited any such claim for relief. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (stating that the appellant's brief must contain argument supported by authority and that "[p]oints not argued are forfeited and shall not

- 16 -

be raised in the reply brief, in oral argument, or on petition for rehearing"); *Sharp v. Baldwin*, 2020 IL App (2d) 181004, ¶ 15 (the plaintiff forfeited his request for relief where he failed to raise it in his initial brief). We will not remand for a new discharge hearing where defendant does not ask for one. Accordingly, we do not consider defendant's contention that counsel was ineffective, because resolution of the issue will not affect the outcome of this appeal. See *Barth v. Reagan*, 139 Ill. 2d 399, 419 (1990) ("Courts of review *** ordinarily will not consider issues where *** the result will not be affected regardless of how the issues are decided."); *Condon v. American Telephone & Telegraph Co.*, 136 Ill. 2d 95, 99 (1990) (same).

¶ 46                                    III. CONCLUSION

¶ 47    For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 48    Affirmed.